# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 94-CA-00507-SCT

*TXG INTRASTATE PIPELINE COMPANY*

*v.*

*DEAN V. GROSSNICKLE, LIQUIDATING*
*TRUSTEE FOR XENEREX PARTNERS, LTD.*

*AND*

*DEAN V. GROSSNICKLE, LIQUIDATING*
*TRUSTEE FOR XENEREX PARTNERS, LTD.*

*v.*

*SAN GABRIEL DEVELOPMENT CORPORATION,*
*ENRON OIL TRADING AND TRANSPORTATION*
*COMPANY AND TXG INTRASTATE PIPELINE*
*COMPANY*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/08/94 |
| TRIAL JUDGE: | HON. EDWARD G. CORTRIGHT, JR. |
| COURT FROM WHICH APPEALED: | HOLMES COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | JEFFERSON D. STEWART |
| ATTORNEYS FOR APPELLEES: | BILLY JOE GILMORE |
| | RONALD M. KIRK |
| | GLENN GATES TAYLOR |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | ON DIRECT APPEAL: REVERSED AND RENDERED IN PART; REVERSED AND REMANDED IN PART. ON CROSS-APPEAL: AFFIRMED - 10/16/97 |
| MOTION FOR REHEARING FILED: | 11/7/97 |
| MANDATE ISSUED: | 6/25/98 |

**BEFORE SULLIVAN, P.J., McRAE AND ROBERTS, JJ.**

**ROBERTS, JUSTICE, FOR THE COURT:**

## STATEMENT OF THE CASE

¶1. This case was first tried in January 1993 to determine whether Xenerex Partners, Ltd. owned a 37.5% working interest in a gas well known as the Smith Well and approximately 5,000 acres of oil and gas leases, all located in Holmes County, Mississippi. In a March 24, 1993, "Judgment on Plaintiff's Claims of Ownership", the chancellor ruled that Xenerex did own equitable title to an undivided 37.5% working interest in those properties on the basis of resulting and constructive trusts and was entitled to full title thereto. However, he reserved for further consideration: Plaintiff's claims for an accounting and questions as to what extent the Limited Partnership's interest was subject to any costs or claimed liens.

¶2. The original suit was filed on May 20, 1988, by Dean V. Grossnickle, Liquidating Trustee for Xenerex. Named as defendants were the holder of record title to the Mississippi Property, San Gabriel Development Corporation, the Transportation Company (EOTT), and Mississippi Valley Gas Company, and other necessary parties who were asserting various liens and security interests on the Mississippi Property.

¶3. On May 20, 1988, Grossnickle filed a lis pendens notice in the office of the Holmes County Chancery Clerk. The second amended complaint was filed on September 10, 1990, adding as defendants a later purchaser of production, TXG Intrastate Pipeline Company, and several other necessary parties who were asserting royalty interests in leases taken in an area referred to as the Thornton Field after this suit was filed.

¶4. By notice of trial setting filed October 14, 1993, the parties were given notice that the case was set for trial on January 24, 25, and 26, 1994. TXG filed its motion to amend and supplement its answer, and to assert a counter claim against Plaintiff on January 7, 1994. TXG also filed its Motion for Joinder and Substitution of Proper Parties Plaintiff in This Cause. The court denied these motions at the start of the trial on January 24, 1994. On April 12, 1994, the Final Judgment was entered, by which the court: (1) rendered judgment in the amount of $125,614.85 against San Gabriel for the Partnership's share of production through November 30, 1993, but without allowing any recovery for gas produced from 1985 to 1988; (2) imposed a lien on the other 62.5% interest in the Mississippi Property and on all future production proceeds attributable to that interest in order to satisfy the portion of the judgment against San Gabriel for production occurring from 1985 to 1988, and (3) ordered TXG and EOTT to account to and pay the Limited Partnership proceeds for production attributable to its interest that TXG and EOTT had purchased since December 1990.

¶5. TXG's post-trial motion was denied by the court's order of May 2, 1994. TXG filed a notice of appeal on May 26, 1994. The partnership cross-appealed against TXG, San Gabriel, and EOTT by notice filed June 7, 1994.

¶6. TXG raises the following issues on appeal:

**I. WHETHER REASONABLE COSTS ACTUALLY INCURRED BY TXG AND MILMAC TO RESTORE AND OPERATE THE SMITH WELL AFTER DECEMBER 1990 ARE A NECESSARY PART OF ANY ACCOUNTING INCIDENT TO THE**

**PLAINTIFF'S 37.5% WORKING INTEREST IN THE SMITH WELL AND SHOULD BE SHARED BY THAT INTEREST.**

**II. WHETHER, IN THE ACCOUNTING ON XENEREX PARTNER'S 37.5% WORKING INTEREST, THE CHANCELLOR ERRED IN DENYING TXG'S MOTION TO FILE AN AMENDED AND SUPPLEMENTAL ANSWER AND EXCLUDING EVIDENCE PROFFERED BY TXG OF COSTS IT INCURRED TO RESTORE THE SMITH WELL BACK TO PRODUCTION.**

**III. WHETHER PLAINTIFF'S EVIDENCE OF VALUE FOR OIL PRODUCED FROM THE SMITH WELL BETWEEN 1985-1988 WAS COMPETENT OR SUFFICIENTLY RELIABLE TO SUPPORT A JUDGMENT AGAINST SAN GABRIEL FOR $97,216.**

**IV. WHETHER THE CHANCELLOR ABUSED HIS DISCRETION OR EVEN HAD AUTHORITY TO CREATE A JUDGMENT LIEN FOR THE DEBTS OF SAN GABRIEL ON THE OTHER 62.5% WORKING INTEREST AND FUTURE PRODUCTION PROCEEDS WHICH WERE OWNED BY ENTITIES NOT A PARTY TO THIS SUIT.**

**V. WHETHER THE CHANCELLOR ABUSED HIS DISCRETION OR EVEN HAD AUTHORITY TO MAKE THE JUDGMENT LIEN SUPERIOR TO THE PREVIOUSLY PERFECTED SECURITY INTEREST OF MILMAC AND TXG.**

**VI. WHETHER THE CHANCELLOR ABUSED HIS DISCRETION OR EVEN HAD AUTHORITY TO MAKE THE JUDGMENT LIEN SUPERIOR TO MILMAC'S RIGHT TO RECOVER FUTURE OPERATING COSTS.**

**VII. WHETHER THE CHANCELLOR PROPERLY DENIED TXG'S MOTION TO ALTER OR AMEND THE FINAL JUDGMENT TO PROVIDE THAT XENEREX PARTNER'S 37.5% WORKING INTEREST IN THE SMITH WELL BE SUBJECT TO ITS SHARE OF FUTURE OPERATING COSTS.**

**VIII. WHETHER THE CHANCELLOR PROPERLY DENIED TXG'S MOTION FOR JOINDER AND SUBSTITUTION OF PROPER PARTIES PLAINTIFF, ESPECIALLY EMPIRIC ENERGY, INC.**

**IX. WHETHER THE CHANCELLOR PROPERLY DENIED TXG'S REQUEST TO AMEND THE FINAL JUDGMENT TO REFLECT THE OWNERSHIP AND OBLIGATIONS OF EMPIRIC IN THE SMITH WELL AND LEASES.**

**X. WHETHER THE CHANCELLOR'S FAILURE AND/OR REFUSAL TO MAKE FINDINGS OF FACT AND CONCLUSIONS OF LAW ON ISSUES IV.--IX., ABOVE, IS REVERSIBLE ERROR.**

¶7. Grossnickle cross-appealed to this Court on the following issue:

**I. WHETHER THE LOWER COURT ABUSED ITS DISCRETION BY EXCLUDING PLAINTIFF'S EVIDENCE OF THE VALUE OF THE NATURAL GAS PRODUCED**

**AND SOLD FROM THE GAS WELL AT ISSUE DURING THE PERIOD FROM 1985 UNTIL 1988, AND DENYING PLAINTIFF A JUDGMENT FOR THAT AMOUNT OF MONEY.**

## STATEMENT OF FACTS

¶8. There is no appeal as to the judgment reached by the chancellor on March 1, 1993. It is the alleged errors that occurred at the subsequent hearing on the accounting that have been brought before this Court. However, in order for there to be a full understanding of this appeal, a recitation of facts that led to the 1993 judgment is necessary. This case began in May of 1988 as a dispute between some of the investors in Xenerex, who owned an undivided 37.5% working interest in the Smith Well and some 5,000 acres of leases surrounding that well in Holmes County. Xenerex Partners' claim was based on the fact they had paid $1.5 million in 1984 to San Gabriel's predecessor, Matrix Energy, Inc., to purchase the 37.5% interest.

¶9. In August 1983, Xenerex Corporation was a Delaware corporation in the oil and gas business. Matrix Energy, Inc., formerly known as Magna Matrix Energy, Inc., was a subsidiary of Xenerex. James J. Ling was the Chairman of Xenerex, and James A. Myers was its President. Ling and Myers also held those positions with Matrix. In November 1980, Matrix obtained title to approximately 5,000 acres of oil and gas leases in the Thornton Field in Holmes County. On or about September 3, 1981, Xenerex, through its subsidiary Matrix, executed a promissory note for $1,200,000 to Bank de l'Union Europeene (BUE), and purported to give BUE a security interest in property, which included fixtures and other interests pertaining to the Smith Well and the oil and gas leases owned by Matrix in the Thornton Field. A UCC financing statement was filed in the Holmes County records, but no deed of trust was ever filed securing the note and apparently none ever existed.

¶10. In August of 1983, Ling distributed copies of a memorandum proposing a $5,000,000 private placement on behalf of Xenerex. Such copies were reviewed by Grossnickle, Albert Susman, and other individuals. Ling and Myers caused Xenerex to prepare a formal "Confidential Private Placement Memorandum" dated September 26, 1983, which offered shares in a Texas limited partnership to be known as "Xenerex Partners, Ltd.," with Xenerex Corporation as the general partner. The proposal was agreed to by Xenerex Corporation, as the General Partner, and by five limited partners, Grossnickle, Susman, A. D. Martin Properties, Inc., Hal R. Pettigrew, and Andrew F. Stasio. The Limited Partnership was then formed and registered in accord with Texas law, and the Limited Partners paid a total of $1,500,000 to Xenerex, for a combination of Xenerex stock and Limited Partnership interests (totaling 99%) in the Limited Partnership.

¶11. Under the private Placement Memorandum, Xenerex agreed to have its subsidiary, Matrix, transfer to the Limited Partnership various oil and gas properties and interests, including an undivided 37.5% share of the 100% working interest to which Matrix held record title in the Mississippi Property. During 1984 and early 1985, Grossnickle inquired of Myers, the President of Xenerex and Matrix, whether the various oil and gas interests, which were to be assigned to the Limited Partnership, had in fact been assigned. Myers told Grossnickle that the assignments had been made, and he would provide Grossnickle with copies of the assignments.

¶12. On September 16, 1985, Xenerex and Matrix filed a Chapter 11 bankruptcy petition in Oklahoma. Although Myers represented to Grossnickle that the assignments of the Mississippi

Property had been made by Matrix to the Limited Partnership, no assignment had been made at the time Xenerex and Matrix filed for bankruptcy. Therefore, legal title to the Mississippi Property remained in Matrix when Matrix went into bankruptcy.

¶13. Soon after the bankruptcy petition was filed, Ling and Myers initiated their plan to have San Gabriel, their new company, acquire the Mississippi Property. On October 10, 1985, Ling prepared a memorandum detailing how a corporation, namely Hill Investors, Inc., could acquire the Mississippi Property from Matrix. Ling had resigned from his positions as Chairman of Xenerex and Matrix after the bankruptcy petition was filed, and was serving as the President of Hill Investors. By early 1986, Ling had also become an officer and director of San Gabriel, and prepared a "business plan" to acquire the Mississippi Property by April 1986. In April 1986, with Myers serving as its attorney and consultant, San Gabriel entered into an agreement to acquire the BUE note.

¶14. On May 6, 1986, Xenerex and Matrix, by Myers, filed a motion in their bankruptcy case to abandon the Mississippi Property from the bankruptcy estate. The stated purpose of the motion was to obtain a release and satisfaction of the BUE note, which Xenerex and Matrix represented was secured by the Mississippi Property. However, the Mississippi Property never secured the BUE note. On September 11, 1986, the bankruptcy court entered its Order of Abandonment allowing Xenerex and Matrix to abandon all of their interests in the Mississippi Property in exchange for San Gabriel's release of the BUE note. Acting upon that Order, Matrix, through Myers, assigned the Mississippi Property to San Gabriel on September 11, 1986.

¶15. Grossnickle and Susman first learned of the Motion and Order of Abandonment, and the Matrix assignment to San Gabriel, on October 29, 1986, at the first meeting of creditors of Xenerex and Matrix. Grossnickle and Susman filed a Motion to Vacate the Order of Abandonment and objections to the Joint Disclosure Statement, which Matrix and Xenerex had filed in their bankruptcy case. The motion stated, in relevant part, that Xenerex and Matrix had held the Mississippi Property in constructive trust for the benefit of the partners of the Limited Partnership, and it would be a fraud against the Limited Partners to permit Xenerex, the General Partner and owner of only a 1% interest in the Partnership, to abandon the property for its and other's benefit.

¶16. In response, Xenerex and Matrix, by Myers, filed an amended disclosure statement on November 17, 1986. They acknowledged that they "had requested, and believed, that assignments of such oil and gas properties to Xenerex Partners had been prepared and recorded, although recent oral inquires by the debtors to the County Recorders Office in Holmes County, Mississippi, revealed that such assignments are not recorded." Xenerex and Matrix also acknowledged the Limited Partnership's interest in the Mississippi Property, and indicated they did not intend to abandon that interest out of the bankruptcy estate.

¶17. On February 19, 1987, the bankruptcy court denied the Motion to Vacate Order of Abandonment, but amended that Order to provide that nothing therein "shall be construed as affecting or impairing the rights, if any, of the Movant, Albert Susman and/or Dean V. Grossnickle, or any other third party, in and to the properties abandoned by Debtors and described in said Order of Abandonment." In April 1988, the bankruptcy court gave the Limited Partners the option of taking a "formula" claim in bankruptcy, or pursuing recovery of the Limited Partnership's 37.5% interest in the Mississippi Property. The Limited Partners elected the latter option and, through Grossnickle as

the Liquidating Trustee of the Limited Partnership, filed this suit in May of 1988.

¶18. On November 17, 1986, the same day that he acknowledged the Limited Partnership's interest in the Mississippi Property in the Xenerex-Matrix bankruptcy case, Myers prepared and executed a document which he claimed to be an assignment by the Limited Partnership to San Gabriel of the Limited Partnership's interest in the Mississippi Property. Myers purported to execute the document as President of Xenerex and in the capacity of general partner of the Limited Partnership. He claimed that the instrument was executed pursuant to written consents obtained from three of the Limited Partners, Martin, Pettigrew and Stasio. Myers testified that he obtained their consent by representing to them that the Mississippi Property was dilapidated, hazardous, of insignificant value, and subject to secured debt. The instrument in question does not contain any words of grant or assignment, was never recorded, and was not disclosed to Grossnickle or Susman until August 1988.

¶19. The court below found that Xenerex did not have the authority to execute such an assignment of the Limited Partnership's interest. When Xenerex took bankruptcy, the Limited Partnership was automatically dissolved under the Articles of Limited Partnership. Upon dissolution, the Limited Partnership could conduct no further business other than winding up and final distribution of assets to the partners, and then only through the "Liquidating Trustee." Xenerex had no authority to act as Liquidating Trustee because of its bankruptcy, and was not elected Liquidating Trustee. Even if Xenerex had been elected Liquidating Trustee, the court further concluded, it could not, under the articles, have assigned partnership property to any one other than the partners.

¶20. Ling and Myers, apparently in an attempt to extinguish the Limited Partnership's 37.5% interest, began to take new leases that would "wash out" the leases subject to the interest. The oil, gas and mineral leases, which covered the Smith Well when the Limited Partnership was formed, were executed by the lessors in 1980 for a primary term of five years. Around March 1990, San Gabriel began negotiating with TXG to sell the Tchula Lake gas plant (which processes gas from the Smith Well), and associated pipeline to TXG. One of the conditions which Ling and Myers put on the proposed sale was that TXG had to obtain new leases covering the Smith Well, and assign those leases to San Gabriel. TXG acquired new leases and, as part of the closing on the sale for the gas plant and pipeline by San Gabriel to TXG , assigned those leases to San Gabriel.

¶21. After it acquired the processing plant, TXG learned that the Smith Well was unable to produce because of mechanical problems. TXG entered into discussions with San Gabriel about someone taking over operations of the well and spending the money necessary to return it to production. TXG did not have the expertise or inclination to become the well operator. Instead, it agreed to lend money to an experienced operating company, namely Milmac, who had agreed to take over the operation from San Gabriel and attempt to restore the Smith Well to production.

¶22. This arrangement was initially memorialized in two agreements, dated December 18, and December 19, 1990. Under the December 18, 1990, agreement San Gabriel agreed that Milmac would take over operations of the well and, at its own cost, attempt to restore the well to production. In return, San Gabriel agreed to assign 100% of the working interest in the Smith Well and unit leases to Milmac until such time as Milmac had recovered 200% of the amount of monies expended by it to restore and operate the Smith Well out of the production proceeds. In the December 19, 1990, agreement TXG agreed to loan to Milmac the money needed to restore the well to production.

In return, Milmac agreed to assign to TXG all of the interest it received from San Gabriel until TXG recovered 100% of the monies it advanced to the restoration project out of the production proceeds. At that point and time, TXG and Milmac would share the remaining rights to the proceeds received from San Gabriel on a basis of 75% to TXG, 25% to Milmac.

¶23. Milmac took over operations in December of 1990 and proceeded to restore the Smith Well to production. Between December of 1990 and December of 1991, Milmac and TXG collectively spent over $825,000 to restore the well to production. In April of 1991, Milmac began producing the Smith Well again and selling the condensate (oil), while sending the gas to TXG's processing plant where it was processed into sweet gas and other products for sale.

¶24. After the suit was filed, but prior to the chancellor's final judgment, the following assignments of interest in the Smith Well and leases took place (as explained and summarized below):

1. By Assignment dated June 28, 1992, San Gabriel assigned operations and all of its working interests in the Smith Well and leases to Milmac, until 200% of the restoration costs incurred after December 1990 had been recovered out of production. Then the working interest would automatically revert to twenty owners identified in Exhibit B to the Assignment;

2. By individual assignments executed in October and November 1992, all of the assignees of the reversionary interest assigned their interest in the Smith Well and leases to Empiric Energy, Inc.;

3. By three separate assignments, dated October 6, 1992, and January 18, 1993, A. D. Martin, Jr., Hal R. Pettigrew and Andrew F. Stasio each assigned all of their interests in Xenerex Partners, Ltd. and any property they were or may be entitled to receive in liquidation, including but not limited to the Smith Well and leases and any recovery from this lawsuit to Empiric Energy, Inc.;

4. By assignment dated January 22, 1993, Plaintiff assigned all right, title, and interest of Xenerex Partners, Ltd. in the Smith Well and leases and any recovery from the lawsuit to the following parties:

DJN, Inc. 1.00%

Dean V. Grossnickle 13.20%

Albert Susman 33.00%

Andrew F. Stasio 13.20%

A. D. Martin Properties, Inc. 13.20%

Hal R. Pettigrew 26.40%

¶25. The interest conveyed to A. D. Martin Properties, Inc., Hal R. Pettigrew and Andrew F. Stasio, having previously been assigned to Empiric Energy, Inc., totaled 52.8% of Xenerex's 37.5% working interest in the Smith Well and leases, as well as 52.8% of any recovery out of the lawsuit. Thus, after January 22, 1993, Empiric Energy, Inc., was owner of 52.8% of the Xenerex 37.5% working

interest.

¶26. Xenerex's claim was based on the fact they had paid $1.5 million in 1984 to San Gabriel's predecessor, Matrix, to purchase the 37.5% interest in the Mississippi Property. In three counts Xenerex (1) claimed it owned equitable title to an undivided 37.5% working interest in the Smith Well and surrounding leases and that San Gabriel was holding legal title in a resulting or constructive trust for the benefit of Xenerex, (2) requested the court remove San Gabriel's claim of owning 100% of the Smith Well and leases as a cloud on its title, and (3) requested San Gabriel be compelled to convey title to the undivided 37.5% working interest to Xenerex or alternatively, to return the purchase price of $1,500,000. At the same time, Xenerex filed a lis pendens notice in Book 2 of the lis pendens records of Holmes County. TXG was not made a party to the litigation at this time.

¶27. On September 10, 1990, Xenerex filed its second amended complaint, adding TXG and others as additional Defendants. The first three claims asked for the same relief asked for in the original complaint. Xenerex added a fourth claim requesting that the court cancel certain "top leases" acquired by San Gabriel in 1990 or that, in the alternative, it impose a constructive trust on those top leases. In a new fifth claim, Xenerex requested that the court require all Defendants to render an accounting and to pay the Plaintiff the proceeds from the sale of all gas, sulfur or other minerals attributable to its 37.5% interest in the well. In a new sixth claim, Plaintiff sought an Attachment in Chancery under Miss. Code Ann. § 11-31-1, *et seq.* on all monies attributable to San Gabriel's interest in production from the Smith Well and leases. In a new count seven, the Plaintiff asked for a preliminary injunction against San Gabriel and the purchasers of oil and gas from the Smith Well, requiring them to pay all monies attributable to the production of those minerals into the Registry of the Court. No additional or supplemental lis pendens was filed.

¶28. On January 19 and 20, 1993, trial on the merits was had before the chancellor. The agreements between San Gabriel/Milmac and Milmac/TXG were introduced as exhibits, and TXG had San Gabriel's president explain the agreements to the court. On March 2, 1993, the court issued its opinion and directed counsel for the Plaintiff to draft a judgment. In the 1993 judgment, the chancellor vested legal title of an undivided 37.5% of 100% working interest in and to the Smith Well, its production unit, and the surrounding leases into Xenerex. The court then stated:

> Plaintiff's claims for an accounting, and the questions as to what extent the Limited Partnership's Interest is subject to any costs or claimed liens, have been reserved by the Court for subsequent determination.
>
> . . .
>
> IT IS FURTHER ORDERED that Defendants shall provide Plaintiff with an accounting for all production, proceeds from production, and claimed costs and liens relating to the Limited Partnership's Interest, said accounting to be provided to Plaintiff's counsel within thirty (30) days from the date of that judgment is entered. The parties are then granted sixty (60) days from the date that the accounting is provided in which to confer, exchange information and documents and conduct discovery on any questions relating to the accounting and whether and to what extent the Limited Partnership's Interest may be subject to any claimed costs or liens. The Court will then set a date to hear and resolve the remaining claims and issues.

¶29. Within two months of the 1993 judgment, TXG and Milmac had provided accounting information on the restoration costs and the amount of gas sold to Plaintiff's attorney. On May 26, 1993, Plaintiff filed its "Fourth Set of Interrogatories and Third Request for Production of Documents to all Defendants." On July 6, 1993, TXG filed its response as follows:

> INTERROGATORY NO. 40: On a monthly and cumulative basis since January 1, 1984, identify what you claim have been the costs and expenses of the Well, the identity of the documents which support your claim of those costs and expenses, and the identity of all persons who have knowledge of those costs and expenses.

> RESPONSE TO INTERROGATORY NO. 40: TXG has never operated the Smith Well and therefore, has no information concerning the costs and expenses of the Smith Well. Such information is believed to be in the hands of San Gabriel. . .or Milmac Operating Company, the prior and present operators of the Well.

¶30. No complaint as to the sufficiency of TXG's response was made.

¶31. Later, on September 22, 1993, Plaintiff filed a Motion to Compel Answers to Interrogatories and Request for Production of Documents from San Gabriel. On September 23, 1993, it also filed its Fifth Set of Interrogatories and Fourth Request for Production of Documents to all Defendants. San Gabriel filed no response to the Motion to Compel. On October 14, 1993, the chancellor entered an order compelling San Gabriel to respond to the Fourth Set of Interrogatories and Third Request for Production of Documents as follows:

> If San Gabriel fails to [respond to the Fourth Set of Interrogatories and produce the documents requested in the Third Request for Production of Documents] within the said twenty-day period, then at the trial which is to be held on the accounting phase and money judgment aspect of this action, San Gabriel and its agents, servants, employees and attorneys shall be prohibited from introducing any evidence of any claimed costs and liens relating to the "Limited Partnership's Interest". . .

San Gabriel did not respond to the Fourth Set of Interrogatories and Third Request for Production of Documents. However, on November 2, 1993, it did respond to Plaintiff's Fifth Set of Interrogatories and Fourth Request for Production of Documents.

¶32. On September 28, 1993, Plaintiff filed a Motion to Require the Deposit of Production Proceeds into the Registry of the Court. TXG opposed said Motion on the grounds that it had a right to first recover the costs it incurred to restore the Smith Well out of that production. On October 20, 1993, the court ordered TXG and Enron, purchasers of production from the Smith Well, to begin depositing proceeds attributable to the Plaintiff's 37.5% working interest in the Smith Well into the Registry of the Court.

¶33. The parties had been on notice since October 13, 1993, that trial was set to begin on January 24, 1994. On January 7, 1994, TXG filed a Motion to Amend and Supplement its Answers to the Second Amended Complaint and also a Motion for Joinder and Substitution of Proper Party Plaintiffs. According to Grossnickle, this was the first time that TXG asserted any claim to offset proceeds attributable to the Limited Partnership's 37.5% interest against the monies TXG loaned to Milmac.

¶34. On January 18, 1994, TXG filed a notice to take the 30(b)(6) deposition of Empiric. Plaintiff responded to that notice by filing a Motion for a Protective Order to prevent TXG from taking that deposition. Between January 18th and 24th, both Plaintiff and TXG filed responses and rebuttals to the three pending Motions. Included as Exhibit 1 to TXG's Rebuttal to the Motion for Joinder and Substitution of Proper Party Plaintiffs was a Waiver of Service and Appearance by Empiric in which Empiric admits that the 52.8% interest in Xenerex 37.5% working interest it acquired was subject to the right of TXG and Milmac to recover the restoration and operating costs they have incurred since December 1990. The deposition of Ling, President of Empiric, was taken on January 20, 1994.

¶35. On January 24, 1994, the parties appeared before the chancellor on the Motions and the accounting phase of the case. At that time, the chancellor overruled TXG's two Motions. The chancellor also sustained the Plaintiff's Motion for a Protective Order on the taking of the deposition of Empiric. The chancellor then proceeded to hear testimony from the Plaintiff regarding revenues it claimed was owed on the Xenerex 37.5% working interest in the Smith Well and leases. The chancellor received testimony from TXG as to gas production and revenues since December 1990. However, he sustained objections as to the introduction of any proof as to costs incurred by TXG to restore the Smith Well after December of 1990. He further sustained an objection to introduction of the deposition of Empiric.

¶36. On March 8, 1994, the court entered its opinion on the accounting phase of this case. Pursuant to that opinion, counsel for the Plaintiff submitted a proposed Final Judgment. After an exchange of letters regarding the form and content of the proposed Final Judgment, the chancellor, on April 12, 1994, entered his Final Judgment. On April 19, 1994, TXG filed its Motion to Alter or Amend the Judgment or, Alternatively, for Additional Findings. On May 3, 1994, the court entered its Order overruling that Motion. From these proceedings on the lower court level, TXG has perfected its appeal and Grossnickle perfected its cross-appeal to this Court.

**DISCUSSION OF ISSUES**

**I. WHETHER REASONABLE COSTS ACTUALLY INCURRED BY TXG AND MILMAC TO RESTORE AND OPERATE THE SMITH WELL AFTER DECEMBER 1990 ARE A NECESSARY PART OF ANY ACCOUNTING INCIDENT TO THE PLAINTIFF'S 37.5% WORKING INTEREST IN THE SMITH WELL AND SHOULD BE SHARED BY THAT INTEREST.**

¶37. In its 1993 judgment, the court held that Xenerex was the owner of an "undivided 37.5% of the 100% working interest in and to the said Smith Well,. . ., its production unit, and the oil, gas, and mineral leases which cover the well and its production unit." A "working interest" ownership is the ownership of oil, gas, and mineral leases. This interest creates in the owner the exclusive right and implied obligation to explore for and develop those minerals by drilling. *See Nations v. Sun Oil Co.*, 695 F.2d 933, 938 (5th Cir. 1983).

¶38. In December 1980, the unit for the Smith Well was "integrated" by the Mississippi State Oil and Gas Board pursuant to Miss. Code Ann. § 53-3-7. In that order, the Board expressly found that "the operator is authorized to be reimbursed the proportionate cost of the drilling, completing, equipping and operating, including a reasonable charge for supervision, of all drilling and production in said pooled unit according to law." When the drilling unit for a well is "force-integrated" under Miss.

Code Ann. § 53-3-7, the well operator may recover from a non-consenting owner only those costs of development or production that are (1) actually incurred, (2) necessary, and (3) reasonable. ***Pursue Energy Corp. v. State Oil and Gas Bd.***, 524 So. 2d 569, 571 (Miss. 1988). In an accounting between co-tenant working interest owners for production from a unit, the non-producing co-tenant is entitled only to his share of the production proceeds after the reasonable, actual costs incurred by the producing co-tenant in developing and operating the unit have been deducted. ***Mills v. Damson Oil Corp.***, 931 F.2d 346, 349-50 (5th Cir. 1991).

¶39. Grossnickle, in testimony before the chancellor, admitted that the interest Xenerex received was a working interest and that the partnership would be expected to make a contribution to any costs incurred in any production from the well.

¶40. Under Mississippi law, an accounting of oil and gas interests must include **consideration** of expenses. In ***Mills***, the Fifth Circuit Court of Appeals upheld a district court ruling that an operator account to the plaintiff for production "less development and production expenses." ***Id.*** at 349. In reaching this decision the Fifth Circuit quoted from ***Martin v. Humble Oil and Refining Co.***, 199 F. Supp. 648, 653 (S.D. Miss. 1960), *aff'd and remanded on other grounds*, 298 F.2d 163 (5th Cir. 1961), *cert. denied*, 371 U.S. 825 (1962), the following:

> [T]here can be no question but what the Humble Oil and Refining Company had the right to go into the land and explore, drill, produce and take the oil and gas therefrom. It, in effect, became a co-tenant of the Plaintiff herein, but when one co-tenant develops oil and gas, he is under the duty to account to the others who do not join with him from their pro rata share of the minerals taken from the soil, after deducting the cost of production.

We find that the costs incurred by Milmac, which were fronted by the loan from TXG, should have been included in the accounting conducted by the chancellor. The reasonable costs of production should have been deducted pro rata from the 37.5% working interest before payment was made.

¶41. Grossnickle does not dispute the above interpretation of Mississippi law. He contends TXG cannot deduct the pro rata costs of production attributable to the 37.5% working interests because TXG is not and was not an operator of the Smith Well, nor was the money loaned to Milmac an actual cost of operation.

¶42. Grossnickle claims that TXG has merely been a purchaser of the well's production. San Gabriel was appointed the operator of the Smith Well in April 1987 by the State Oil and Gas Board, and was still the operator at the time briefs for this appeal were filed. Beginning on March 1, 1991, Milmac, and those hired by Milmac, have provided the actual operating services for the well pursuant to an agreement with San Gabriel. TXG, by separate agreement discussed above, loaned money to Milmac in order for Milmac to restore the well to production. Grossnickle claims that TXG is not and never has been the actual operator of the well. Therefore, his interpretation of Miss. Code Ann. § 53-3-7 does not give TXG any right to deduct costs incurred by San Gabriel or Milmac from the proceeds that TXG owes to the Limited Partnership for its 37.5% working interest.

¶43. TXG responds that Miss. Code Ann. § 53-3-7 specifically allows the Limited Partnership's working interest to be properly charged with the appropriate costs of developing and restoring the Smith Well. This Court agrees, notwithstanding the fact that TXG is not the actual operator of the

Smith Well. In Miss. Code Ann. § 53-3-7 (2)(g) and (h), the terms "operator and/or appropriate consenting owners" are used to delineate the specific parties to be reimbursed for expenses where it indicates the parties who share in the payment of the costs also share in the recovery out of production. The term "owner" is defined at Miss. Code Ann. § 53-1-3 (g) as "the person who has the right to drill into and produce from any pool, and to appropriate the production either for himself or for himself and another or others. . ." The Court interprets the language contained in the statute as not requiring a party to be an actual operator of a well before recovery of incurred costs can be had. The language only requires the party to have a right to appropriate the production to himself or others. Because of the assignment with Milmac, TXG had a right to receive the production from the well to be reimbursed for the money it loaned Milmac. Grossnickle's argument that the Limited Partnership should not have to deduct expenses from its pro rata share of the proceeds from the well because TXG is not an actual owner is without merit.

¶44. Next Grossnickle claims that the loan by TXG to Milmac was not an actual cost of operation. Grossnickle states that TXG has not incurred any actual costs of operation which can be deducted from production proceeds under Miss. Code Ann. § 53-3-7. The only support Grossnickle provides the Court as to this theory is found in a footnote in his brief.[1] It is unclear how this supports Grossnickle's argument. He further states that TXG does not claim that it has provided operating services for the well. Because no authority was cited to this Court on that point this argument is not to be considered. *See* **Gerrard v. State**, 619 So. 2d 212, 216 (Miss. 1993) (claims with no citation in support are not to be considered as they are not properly before the Court).

¶45. TXG responds to Grossnickle's claim that the loan was not an actual cost of operation by stating the loans were made solely for actual, reasonable costs used to restore the Smith Well to productive status. TXG claims this was evidenced in the December 19, 1990, agreement wherein TXG agreed to "pay. . .to Milmac an amount equal to the Actual Cost of performing the Work ('Prepay') by paying to Milmac amounts that are invoiced by Milmac in accordance with Sections 1 & 2 with its agreement with [San Gabriel]." Under the Milmac/San Gabriel agreement, Milmac was required to render "an itemized statement containing a detailed description of each major item of the Work actually performed and the Actual Cost incurred by [Milmac] with respect thereto, ('Actual Cost')." At trial, TXG tried to introduce, then proffered evidence, that the invoices and supporting documents from Milmac constituted reasonable and necessary expenses solely related to the workover operations on the Smith Well.

¶46. TXG responds to Grossnickle's contention that TXG's evidence was inadmissible because no one ever produced supporting documentation, such as invoices and payment records, by stating the contention is simply not true. TXG directs this Court's attention to two points. First, TXG provided Grossnickle with supporting documentation in its response to Grossnickle's interrogatory No. 45. Secondly, TXG claims that Grossnickle waived any objection to the payment records when he stipulated to the accuracy of TXG's proffered evidence on well costs.

¶47. Lastly, TXG presents this Court with the argument that under the 1993 judgment by the chancellor San Gabriel was determined to hold legal title to the 37.5% working interest only as a constructive trustee. Because TXG had received its rights in the well by way of the assignment from Milmac, who had received its rights in the well by assignment from San Gabriel (the original constructive trustee), TXG claims to also stand in the position of constructive trustee instead of San

Gabriel. This would mean where any money is spent by the constructive trustee to preserve or improve the trust property held in trust, those costs should be borne by the beneficiary's income. *Russell v. Douglas*, 243 Miss. 497, 506, 138 So. 2d 730, 734 (1962).

¶48. Grossnickle counters that TXG was not held to be and does not now claim that it was the Limited Partnership's constructive trustee, and thus has no claim as a constructive trustee to recover the monies it loaned to Milmac from the Limited Partnership or the 37.5% interest. Grossnickle states that if TXG is attempting to claim constructive trustee status as a subrogee of San Gabriel, the subrogee has no greater rights than the subrogor. *Meridian Prod. Credit Ass'n. v. Edwards*, 231 So. 2d 806, 808 (Miss. 1970). Grossnickle then argues that TXG lost any such claim by San Gabriel's failure to pursue it at trial. However, we find Grossnickle's argument without merit. TXG attempted to put on evidence of the costs associated with the production of the Smith Well, but was denied the opportunity. Therefore, because TXG was a named defendant and denied the opportunity to present evidence as to the costs associated with the Smith Well, Grossnickle's argument is without merit and not properly before the Court.

¶49. TXG claims the exclusion of such evidence made it impossible to correctly account for that working interest. Further, TXG contends that when the chancellor awarded the Limited Partnership 37.5% of the past revenues, without the concurrent costs to obtain those revenues, the chancellor transformed the working interest into a royalty interest (non-cost bearing). We agree with TXG. The 37.5% interest had already been determined to be a working interest (cost bearing). Equity would require the 37.5% working interest bear its pro rata share of the costs associated with production. The chancellor erred by not allowing the evidence of costs to be considered in the accounting of the proceeds of production from the Smith Well. This case is reversed and remanded for a new trial with instructions for the chancellor to consider costs of production consistent with the decision of this Court.

> **II. WHETHER, IN THE ACCOUNTING ON XENEREX PARTNER'S 37.5% WORKING INTEREST, THE CHANCELLOR ERRED IN DENYING TXG'S MOTION TO FILE AN AMENDED AND SUPPLEMENTAL ANSWER AND EXCLUDING EVIDENCE PROFFERED BY TXG OF COSTS IT INCURRED TO RESTORE THE SMITH WELL BACK TO PRODUCTION.**

¶50. In his opinion on March 8, 1994, the chancellor denied TXG's Motion to Amend its Answer and Counterclaim on two grounds: "untimeliness and the fact that TXG had no greater rights than its remote grantor, San Gabriel, which had been foreclosed from putting on proof of costs and expenses for failure to comply with discovery requests."

¶51. As to the timeliness issue, the court summarized:

> Otherwise put, TXG went from December 19, 1990, until January of 1994 without asserting any claim for monies advanced Milmac based either upon the aforesaid assignment of the other legal theories advanced in its proposed counterclaim. Furthermore, TXG cannot claim that the terms of the judgment of March 24, 1993, was sufficiently broad to admit proof of a claim existing since December of 1990 to be belatedly asserted. The language of that judgment providing that after accountings [sic] were made by the applicable defendant the Court would set a date to hear "the remaining claims and issues" obviously had reference to claims and issues

which had been asserted at the time the judgment was rendered. The language clearly was not intended as an open invitation for parties to wait a year and then on the eve of the second hearing assert claims not previously advanced.

TXG asserts that in holding the motion to amend to be untimely, the chancellor ignored evidence in the record and in the previous trial that made clear TXG's claims had been "previously advanced." TXG states that the Plaintiff and the chancellor were placed on notice of TXG's claim to recover restoration costs from 100% of the production from the Smith Well at the first trial in January 1993. TXG argues that counsel for the Plaintiff, along with counsel for TXG, met in chambers with the chancellor during the first trial and openly discussed TXG's claims to 100% of the revenues from the Smith Well based on the contractual right set forth in the letter agreements that had been admitted into evidence that day.

¶52. TXG asserts that the Plaintiff was further placed on notice as to TXG's claims when counsel for the Plaintiff, counsel for TXG, and representatives from TXG and Milmac met in Jackson to discuss the reworking costs and operating costs, along with the oil revenues associated with the Smith Well. At that time, an accounting of the restoration costs prepared by Milmac was given to the Plaintiff and TXG's claim to recovery of costs out of 100% of the revenues was again discussed. On May 6, 1993, TXG's director of marketing sent a letter to Plaintiff's counsel again discussing the workover costs incurred by Milmac and Plaintiff's obligation to bear its 37.5% share.

¶53. Attached as Exhibit 2 to Plaintiff's September 22, 1993, Motion to Compel Discovery from San Gabriel were a number of documents previously made available to the Plaintiff.[2] Plaintiff's counsel and the chancellor were again advised of TXG's claim and position in TXG's October 12, 1993, Response to Plaintiff's Motion for Deposit into Court.[3]

¶54. On October 12, 1993, counsel for TXG also sent a letter to Plaintiff's attorney and the chancellor reiterating its present position in the litigation.[4] On October 13, 1993, counsel for the Plaintiff also sent a letter to the chancellor.[5]

¶55. TXG asserts to this Court that because of the above correspondence and documentation between the Plaintiff, Defendant, and the chancellor, adequate notice was given as to its claims for costs of production associated with reworking the Smith Well. TXG explains the informality associated with the exchange of information was a result of the chancellor's March 24, 1993, judgment.[6] TXG interpreted the language "remaining claims and issues" to be those that remain after the informal accounting to Plaintiff, the exchange of information, and discovery by all Defendants. Further, TXG asserts the letter from the Plaintiff to the chancellor on October 13, 1993, made it clear that the Plaintiff thought the claims of TXG were at issue.

¶56. TXG argues before this Court that it complied with the lower court's requirement of an accounting and with the discovery requests made upon it by the Plaintiff. Milmac, who was not even a party to the litigation, provided a detailed accounting of the restoration costs incurred after December 1990 on the Smith Well. On January 7, 1994, TXG filed its Motion to Amend its Answer in order to restate its "remaining claims and issues" before the court. TXG claims that this was in compliance with Miss. R. Civ. P. 15, which provides that a party's request to amend or supplement its pleading should be "freely given when justice so requires."

¶57. Grossnickle responds by asserting motions for leave to amend pleadings are addressed to the sound discretion of the trial judge. *Simmons v. Thompson Mach. of Miss., Inc.*, 631 So. 2d 798, 800 (Miss. 1994). This Court has affirmed the denial of motions to amend for undue delay or the failure to exercise due diligence. *See, e.g., Natural Mother v. Paternal Aunt*, 583 So. 2d 614, 616-17 (Miss. 1991). The trial court denied TXG's motion for untimeliness and prejudice to Plaintiff, and the discovery sanctions order against San Gabriel, and TXG's failure to establish that its prior omission of the defenses and claim was due to inadvertence, oversight or excusable neglect.

¶58. Grossnickle claims that to allow TXG's amendment would have been prejudicial to his case. An untimely motion to amend may be prejudicial where allowance of the amendment would burden the adverse party with more discovery, preparation, and expense, particularly where the adverse party would have little time to investigate and acquaint itself with the new matter. *Natural Mother*, 583 So. 2d at 617. The motion to amend was filed on January 7, 1994, before trial was set to and did begin on January 24, 1994.

¶59. In practice an amendment should be denied only if the amendment would cause actual prejudice to the opposite party. Miss. R. Civ. P. 15, cmt.; 6 Charles A. Wright & Arthur R. Miller, <u>Federal Practice & Procedure</u>, § 1484 (2d ed. 1990). The chancellor found that allowing the amendment would be prejudicial "for the multiple reasons set forth in Plaintiff's brief," which the court allowed to be placed into the record as Exhibit 101.[7] Grossnickle claims that it was not an abuse of discretion to deny TXG's proposed amendment, contending that it would have raised numerous new legal and factual issues less than three weeks before trial.

¶60. TXG rebuts this with the assertion that San Gabriel raised the issue of Xenerex's working interest bearing its pro rata share of costs since November 30, 1990, as its Twelfth affirmative defense in Response to Plaintiff's Second Amended Petition. Accordingly, and contrary to the chancellor's holding, these issues and claims did in fact exist as of the date of the 1993 Judgment and there was no basis to disallow TXG's amendment on grounds that such claims were untimely made. TXG's amendment would have merely formally pled those issues previously raised at the January 1993 trial.

¶61. Grossnickle's counsel was provided with the relevant evidence nine months prior to the accounting, and he had full knowledge of TXG's claims. TXG's motion to amend was neither untimely nor prejudicial where it merely restated previously raised issues and legal bases for TXG's position in this case that Grossnickle's working interest must be charged with its pro rata share of costs during the accounting. In *Guthrie v. J.C. Penney Co., Inc.*, 803 F.2d 202, 210 (5th Cir. 1986), the defendant was allowed to amend his pleadings where the plaintiff did not show he had suffered any prejudice because of the delay. Because the defense raised no new factual issues and the eleven days remaining prior to trial should have been enough to research the legal issues involved, the judge allowed the amendment to the defense pleadings. *Id.* Likewise, this Court finds that three weeks prior to trial in the case sub judice should have been sufficient for Grossnickle to research the legal issues involved to claims previously asserted, although possibly not specifically enumerated in a formal defense pleading. There is no question that Grossnickle had knowledge of TXG's claim for the 37.5% working interest to share pro rata in the costs of production associated with the Smith Well. We hold that the amendment should have been allowed, and it was an abuse of discretion requiring reversal for the chancellor to deny such an amendment.

¶62. On May 24, 1993, Plaintiff filed its Fourth Set of Interrogatories and Third Set of Requests for Production of Documents to all Defendants. On July 6, 1993, TXG responded by telling Plaintiff it had already given Plaintiff all of the documents and information it had on the accounting and that James McAuley of Milmac and James Ling of San Gabriel would have the rest. TXG's responses were never formally questioned. On September 22, 1993, Plaintiff filed a Motion to Compel San Gabriel to answer that discovery. In that motion, Plaintiff revealed that it had in fact received an accounting from "other parties" and, as part of Exhibit 2 to its motion, attached a detailed list and spreadsheet submitted by San Gabriel in response to discovery which showed $825,067.88 in expenses incurred to restore the Smith Well to operation between December 1990 and December 1991.

¶63. Without any response to the motion by San Gabriel, the chancellor entered his October 14, 1993, Order imposing sanctions if San Gabriel failed to respond to the discovery within 20 days. San Gabriel did not respond to the Fourth Set of Interrogatories and Fifth Request for Production of Documents. However, on November 2, 1993, it did respond to Plaintiff's Fifth Set of Interrogatories and Fourth Set of Request for Production of Documents, filed by Plaintiff at the same time it filed its Motion to Compel.

¶64. A comparison of the Fourth and Fifth Set of Interrogatories reveals that the information provided by San Gabriel in response to the Fifth Set included virtually all information requested in the Fourth Set. San Gabriel's response to the Fifth Set of Interrogatories identified Milmac, through its president, James McAuley, as the proper party to give a detailed list of well costs after December 1990. San Gabriel identified James Myers and James Ling as the only potential witnesses on its behalf and indicated that James McAuley had knowledge of facts and documents relating to well costs. The data regarding workover costs after December 1990 which had been previously supplied to the Plaintiffs was again attached as an exhibit.

¶65. The chancellor used the October 1993 sanctions order against San Gabriel to prohibit TXG, a party in this case since 1990, from introducing any proof of costs it incurred after December 1990. TXG had itself responded to the discovery requests, and Plaintiff had been provided the nature and the amount of restoration costs claimed by TXG in both the informal accounting and responses to discovery. At trial Plaintiff had stipulated as to the accuracy of the well cost figures after 1990, but would not stipulate as to the reasonableness of those costs, nor their admissibility or application to Xenerex Partners' 37.5% working interest.

¶66. Miss. R. Civ. P. 37 (b)(2)(B) authorizes the court to exclude "undisclosed evidence" of a party who fails to comply with a discovery order. *Ladner v. Ladner*, 436 So. 2d 1366, 1370 (Miss. 1983). "Exclusion of evidence is a last resort. Every reasonable alternative means of assuring the elimination of any prejudice to the moving party and a proper sanction against the offending party should be explored before ordering exclusion." *McCollum v. Franklin*, 608 So. 2d 692, 694 (Miss. 1992). "In the imposition of sanction[s], the trial court has considerable discretion in matters pertaining to discovery and its orders will not be disturbed in the absence of abuse of discretion." *Kilpatrick v. Mississippi Baptist Medical Ctr.*, 461 So. 2d 765, 767 (Miss. 1984).

¶67. This Court has "ruled that sanctions may be imposed for the failure to supplement even without a prior court order compelling discovery." *Denman v. Hardy*, 437 So. 2d 426, 429 (Miss. 1983).

"Sanctions would be permitted in such a case because the discovering party would ordinarily have no way of knowing that a response should have been supplemented until he finds out at trial." *Id.* "Also, under the inherent power of courts to protect the integrity of their process, courts may impose sanctions without a court order." *Kilpatrick*, 461 So. 2d at 767.

¶68. Although no order compelling discovery in lieu of sanctions was entered naming TXG, the chancellor used the order naming San Gabriel to impose sanctions on TXG after San Gabriel failed to comply with the chancellor's order. "[A] failure to comply with '. . .an order to provide or permit discovery, including an order [compelling discovery]' is required." *January v. Barnes*, 621 So. 2d 915, 922 (Miss. 1992). The order did not mention TXG, only San Gabriel. The Plaintiff never sought and the court never issued an order which directed TXG to comply with discovery.

¶69. Faced with a similar situation, the Second Circuit Court of Appeals held that a sanctions order directed at one party defendant is not sufficient to warn other parties of potential exposure to discovery sanctions. *Daval Steel Prod. v. M/V Fakredine*, 951 F.2d 1357, 1365 (2d Cir. 1991). In that case there were two corporations owned in part by the same family. One was incorporated in New York, and the other incorporated in Turkey. *Id.* at 1359. At a hearing the court issued an oral order requiring the New York defendant to comply with discovery. *Id.* at 1361. The New York defendant failed to comply with this order, and later the court sustained the plaintiff's motion for sanctions under Fed. R. Civ. P. 37 (b)(2)(B) against both corporate defendants. *Id.* The Second Circuit reversed, stating the court order was directed to the defendant, who had received discovery notices, and not to the second defendant, who was not mentioned in the prior order by the court. *Id.* at 1364.

¶70. Likewise, in the present case, TXG had received no notice for compelled discovery, nor was it mentioned in the chancellor's order imposing sanctions on San Gabriel. Therefore, we hold that the chancellor committed an abuse of discretion by imposing the same sanctions on TXG as it did on San Gabriel where TXG was not a named party in the chancellor's order.

¶71. Grossnickle responds by stating there was no abuse of discretion on the part of the chancellor where he excluded TXG's offer of proof of well costs of production. Grossnickle's argument is two-fold. First, Grossnickle states the chancellor excluded the evidence based on the protective order and motion in limine previously granted by the chancellor. These were granted based on the denial of TXG's motion to amend, the discovery sanctions order, and TXG's supposed untimely assertion of its defenses and claims. However, this Court, as previously discussed above, has determined that the assertion of defenses by TXG was timely and should have been allowed by amended defense pleadings.

¶72. Secondly, Grossnickle asserts the evidence was excluded based on the sanctions order imposed on San Gabriel. Grossnickle argues that San Gabriel's failure to comply prevented San Gabriel and all persons claiming through it from introducing any evidence of any claimed costs and liens relating to the Limited Partnership's 37.5% interest in the Mississippi Property. The sanctions order, as interpreted by Grossnickle, was binding on San Gabriel and its successors-in-interest, regardless of whether those successors were parties or were disclosed. Grossnickle's supporting authority is Rule 25(c) of the Miss. R. Civ. P., which provides:

(c) **Transfer of Interest**. In case of any transfer of interest, the action may be continued by or

against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party. . . .

The official Comment explains:

The most significant feature of Rule 25(c) is that it does not require that any action be taken after an interest has been transferred; the action may be continued by or against the original party and the judgment will be binding on his successor in interest even though he is not named. An order of joinder in such a situation is merely a discretionary determination by the trial court that the transferee's presence would facilitate the conduct of the litigation. . . .

¶73. Labeling TXG as a successor-in-interest to San Gabriel, Grossnickle claims that TXG only attempted to supplement its discovery and amend its pleading to assert any such claim against Plaintiff after the sanctions were imposed on San Gabriel. Further, he asserts that TXG's motion to amend was properly denied as it was an attempt to circumvent the sanctions order by reviving San Gabriel's position.

¶74. Assuming arguendo the successor-in-interest assertion has merit, the order does not name successors-in-interest as parties that will be bound by the chancellor's decision. The order was limited to "San Gabriel and its agents, servants, employees and attorneys." Additionally, TXG's rights in the Smith Well were acquired long before the October 1993 sanctions order. TXG did not acquire its rights from San Gabriel already subject to the sanctions order.

¶75. Rule 25 of the Miss. R. Civ. P. by its terms applies to judgments, not pre-trial discovery orders. Rule 37 of the Miss. R. Civ. P. governs sanctions as to discovery, not Rule 25. Therefore, it was error for the chancellor to impose the same sanctions on TXG as it did on San Gabriel when TXG had complied with all discovery requests. San Gabriel failed to comply with the court's motion to compel discovery. However, TXG had no notice of this motion nor the subsequent motion to compel. To hold TXG accountable to the order naming only San Gabriel when TXG was a separate named defendant in this case would, in this Court's opinion, be inequitable and severe.

### III. WHETHER PLAINTIFF'S EVIDENCE OF VALUE FOR OIL PRODUCED FROM THE SMITH WELL BETWEEN 1985-1988 WAS COMPETENT OR SUFFICIENTLY RELIABLE TO SUPPORT A JUDGEMENT AGAINST SAN GABRIEL FOR $97,216.

¶76. At trial, Plaintiff's counsel attempted, through the testimony of Grossnickle, to introduce Exhibit 104: a chart setting forth oil and gas "revenues" purportedly generated by the Smith Well from May 1985 through May 1988. Grossnickle testified that he obtained the production figure from reports filed with the Oil and Gas Board. The oil and gas prices were estimated "as to what Grossnickle deemed a fair price." The $16.00 per barrel price from 1985-1988 was based on his recollection of reading the Dallas Morning News business section. Grossnickle's testimony pertaining to the price of gas from 1985-1988 was based upon what he believed to be the price under the present gas contract between TXG and San Gabriel (dated May 23, 1990). Grossnickle's testimony was the only evidence offered by the Plaintiff to support the values claimed for the oil and gas produced in 1985-88.

¶77. The chancellor stated in his March 8, 1994 Opinion:

I am of the opinion [Exhibit 104] is entitled to be introduced, but considered in part only. More specifically, the volume of gas and oil produced for the periods shown are admissible. Likewise admissible is the testimony of Mr. Grossnickle, also reflected on the exhibit, that $16.00 per barrel was the average reasonable value for oil produced during the 1985-1988 period. Certainly there was an inexactitude about his valuation, but his opinion was based upon reasonable deductions and conclusions. Mr. Grossnickle was no stranger to the Smith Well in that he was actually the owner of an interest therein. He had a long-standing professional interest in the oil business and in a general way had followed the prices of oil during the 1985-1988 period. Furthermore TXG, having been determined to have no interest in this particular issue, was without standing to object. Based upon Mr. Grossnickle's testimony I find that the Plaintiff's share (37.5%) of the oil produced in the 1985-1988 period is valued at $97,216. However, I cannot accept Mr. Grossnickle's valuation of gas produced during this period as it has no reasonable basis. Mr. Grossnickle estimated the average value of the gas to be 41 ½ cents per MCF, but he admitted to having no knowledge of the value of gas or what price San Gabriel received during the period. He rested his estimate solely on the price of gas as agreed upon in gas contracts executed between TXG and San Gabriel after 1988. This evidence is too speculative to support a judgment.

¶78. TXG argues that while Grossnickle is an accountant, he was not qualified to testify as an expert witness in the area of oil and as to market prices. Therefore, TXG correctly asserts Grossnickle's testimony should be based on personal knowledge in order to be admissible under Miss. R. Evid. 602. TXG also argues that Grossnickle was not an owner of an interest in the Smith Well until he received an assignment from Xenerex Partners in January of 1993. TXG states that because Grossnickle did not buy and sell any oil, especially oil from the Smith Well, he had no personal knowledge of oil prices from the Smith Well from 1985-1988 and had not contacted the purchasers for an accurate determination.

¶79. TXG contends the only evidence presented to support Grossnickle's estimate as to the value of oil produced from the Smith Well was his recollection of the reported price of oil produced in West Texas. TXG hinges its argument on Grossnickle's testimony regarding the Smith Well producing hydrogen sulfide and that oil with hydrogen sulfide (sour oil) sells for less than West Texas "sweet" oil. TXG claims that evidence of sales of "sweet" oil from West Texas, without more, is not competent proof of the value of sour oil which must be processed in Holmes County to be produced and marketed.

¶80. Grossnickle responds by stating that under Mississippi law, "[w]here it is reasonably certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery or prevent a jury decision awarding damages." *Nichols v. Stacks*, 485 So. 2d 1034, 1038 (Miss. 1986) (*quoting Cain v. Mid-South Pump Co.*, 458 So. 2d 1048, 1050 (Miss. 1984)).

Under such circumstances, all that can be required is that the evidence--with such certainty as the nature of the particular case may permit--lay a foundation which will enable the trier of facts *to make a fair and reasonable estimate* of the amount of damage. The plaintiff will not be denied a substantial recovery if he has produced the best evidence available and it is sufficient to afford a reasonable basis for estimating his loss.

*Nichols*, 485 So. 2d at 1038 (emphasis in the original) (*quoting Cain*, 458 So. 2d at 1050.)

¶81. "Liability cannot be escaped on the grounds that the proof as to the amount of damages, if any, is too uncertain to justify the lower court's award." ***Aqua-Culture Technologies, Ltd. v. Holly***, 677 So. 2d 171, 184 (Miss. 1996)(*quoting **R & S Dev., Inc. v. Wilson***, 534 So. 2d 1008, 1012 (Miss. 1988)). "It is well recognized that Mississippi is equally firm in its determination that a party will not be permitted to escape liability because of the lack of a perfect measure of damages his wrong has caused." ***Id.*** (*quoting **R & S Dev., Inc.*** 534 So. 2d at 1012.); *See also **Nichols***, 485 So. 2d at 1038.

¶82. Grossnickle gave his opinion as to a reasonable and fair price for oil during the period from 1985 to 1988. His opinion was based on his personal recollection of oil prices during that period. His personal recollection was based in part on price information that he obtained during that period for other interests he had in oil production in Oklahoma.

¶83. TXG and Grossnickle both cite the ***Piney Woods*** cases to this Court to further their respective positions. However, the cases are clear as to what the law requires. "Market value is a question of fact, and it is up to the finder of fact to determine the probative strength of relevant evidence." ***Piney Woods Country Life Sch. v. Shell Oil Co.***, 726 F.2d 225, 238 (5th Cir. 1984). The method of proof varies with the facts of each particular case. ***Id.*** The finder of fact in the present case was the chancellor. It was his job to determine the relevancy and the weight of the evidence presented by Grossnickle. Grossnickle had to meet his burden of proof by producing sufficient relevant evidence to support his contention. It was TXG's responsibility to rebut Grossnickle's evidence and provide evidence of its own to support its contentions.

¶84. Under Mississippi law, plaintiffs bear the burden of going forward with sufficient evidence to prove their damages by a preponderance of the evidence. ***Piney Woods Country Life Sch. v. Shell Oil Co.***, 905 F.2d 840, 845 (5th Cir. 1990). The Plaintiff attempted to meet this burden when Grossnickle testified as to his recollection of financial reports reproduced in the Dallas Morning News.

¶85. There may have been some speculation as to the certainty of his recollection, but TXG did not offer any more persuasive testimonial evidence to rebut Grossnickle's estimation. With regard to the oil price used by Grossnickle, Gary Rehm of TXG testified:

> Q. Now, what about on the--would it be your position that the average price of $16.00 a barrel that Mr. Grossnickle has used for the 1985 through 1988 period is too high, or do you have a position on that?
>
> A. I don't have a position on that. I do not buy and sell crude.
>
> . . .
>
> Q. Now, you disagree with the $16.00 that Mr. Grossnickle has used?
>
> A. I said my opinion was it might be high.
>
> . . .

Q. Are there any other oil prices you wish to give the Court for the period 1985 through 1988? Average price?

A. No.

¶86. "[W]here the existence of damages has been established, a plaintiff will not be denied the damages awarded by a [fact finder] merely because 'a measure of speculation and conjecture is required' in determining the amount of damages." *Piney Woods Country Life School*, 905 F.2d at 845-46. The chancellor heard all of the testimony and objections to the testimony, as evidenced in the portion of his opinion above, and found the testimony by Grossnickle to be a reasonable assessment of the price of oil. This was based largely on the fact that the chancellor did not have before him any evidence from San Gabriel as to what the price of oil was. San Gabriel did not comply with the order compelling discovery, forcing the Plaintiff to go to trial without the benefit of any price information from San Gabriel or any of the defendants for the pre-suit period of production. Even at trial when TXG was given the opportunity to provide the court with oil prices for the period 1985 through 1988, it did not do so.

¶87. TXG alleges Grossnickle's testimony as to his estimate of the market value of Plaintiff's share of revenue was also inadmissible as hearsay under Rule 803 of the Miss. R. Evid. We agree the testimony was hearsay; however, it was admissible as an exception to hearsay under Rule 803 (17) of the Miss. R. Evid. "It is unquestioned that, in proving the fact of market value, accredited price-current lists and market reports, including those published in trade journals or newspapers which are accepted as trustworthy, are admissible in evidence." *Virginia v. West Virginia*, 238 U.S. 202, 212 (1915); *See Thompson v. Carter*, 518 So. 2d 609, 612 (Miss. 1987) and Comment to Miss. R. Evid. 803 (17). The chancellor correctly allowed Grossnickle's testimony based on his recollection of the market reports in the Dallas Morning News.

¶88. The standard of certainty is that discussed earlier by this Court in *Cain v. Mid-South Pump, Co.*, 458 So. 2d 1048 (Miss. 1984). There the Court stated that all that can be expected is "such certainty as the nature of the particular case may permit" to "enable the trier of facts to make a fair and reasonable estimate of the amount of damage." *Cain*, 458 So. 2d at 1050. At a minimum, proof could have and should have been submitted of prices in the area for high sulphur oil of like gravity reflecting monthly price fluctuations over the period.

¶89. We find that it was error for the chancellor to allow the above discussed testimony of Grossnickle. It lacked sufficient reliability and was impermissibly uncertain to establish and support a judgment of $97,216 against San Gabriel. On remand reasonable proof should be submitted to enable the trier of fact to make a fair and reasonable determination as to the amount of damage.

**IV. WHETHER THE CHANCELLOR ABUSED HIS DISCRETION OR EVEN HAD AUTHORITY TO CREATE A JUDGMENT LIEN FOR THE DEBTS OF SAN GABRIEL ON THE OTHER 62.5% WORKING INTEREST AND FUTURE PRODUCTION PROCEEDS WHICH WERE OWNED BY ENTITIES NOT A PARTY TO THIS SUIT.**

**V. WHETHER THE CHANCELLOR ABUSED HIS DISCRETION OR EVEN HAD AUTHORITY TO MAKE THE JUDGMENT LIEN SUPERIOR TO THE**

**PREVIOUSLY PERFECTED SECURITY INTEREST OF MILMAC AND TXG.**

**VI. WHETHER THE CHANCELLOR ABUSED HIS DISCRETION OR EVEN HAD AUTHORITY TO MAKE THE JUDGMENT LIEN SUPERIOR TO MILMAC'S RIGHT TO RECOVER FUTURE OPERATING COSTS.**

¶90. The chancellor in his opinion dated March 8, 1994, ruled as follows:

[I]n my opinion, Plaintiff's Second Amended Complaint was sufficiently broad to now permit the imposition of a lien upon San Gabriel's 62.5% interest in the Mississippi Property and the proceeds attributable to that interest, subject to the deduction of royalty burdens. Plaintiff's prayer for an attachment of San Gabriel's interest was sufficient notice of the assertion of the lien, albeit Plaintiff chose not to pursue the pre-judgment statutory procedure to perfect a formal attachment. Furthermore, in light of *Smith v. Smith*, 607 So. 2d 122 (Miss. 1992), it appears that a specific prayer for a lien is not required. See also M.R.C.P. 54(c). The duration of such lien being until the sum of $97,216 is paid toward the monetary judgment of $125, 614.85

¶91. The court then entered the following in its Final Judgment:

In addition to all other remedies which Plaintiff has or may have to collect and recover the monies awarded under this Judgment, Plaintiff is entitled to the imposition of and the Court hereby awards, orders and imposes a lien on the other 62.5% interest in the Mississippi Property (the interest not owned by Plaintiff) and on all of the future production proceeds attributable to that interest (after deduction of only severance taxes and royalty burdens) in order to satisfy that portion of this Judgment Plaintiff is owed for its share of production occurring from 1985 through 1988. This lien herein granted and imposed on the 62.5% interest is and shall be superior to and shall have priority over all liens claimed by the Defendants and their successors-in-interest and transferees, including but not limited to any liens claimed as a result of the agreements and assignments entered into by and among San Gabriel, TXG, and Milmac Operating Company on and after December 19, 1990. However, the claim of any royalty owner shall not be affected by such lien. The duration of such lien shall be until the sum of $97,216, owed under paragraph 2(a) above, is paid to Plaintiff toward the total monetary judgment of $125,614.85.

¶92. San Gabriel owned 100% of the legal title to the Mississippi Property when the suit was filed on May 20, 1988. The Complaint stated a principal claim to an undivided 37.5% interest in the Mississippi Property, and an alternative claim for the return of that portion of the $1,500,000 that was paid for that property. A lis pendens notice was filed on May 20, 1988. Plaintiff filed his Second Amended Complaint on September 10, 1990, adding TXG as a defendant. The trial court held the Second Amended Complaint sufficiently broad to permit the imposition of a lien on San Gabriel's 62.5% interest in the Mississippi Property.

¶93. TXG asserts the only claim for a lien on the other 62.5% working interest comes in the "Sixth Claim." The "Sixth Claim" seeks an attachment of all of San Gabriel's interest in the Mississippi Property and the production and proceeds therefrom, including the production and proceeds which come into the hands of TXG. TXG considers this to be an attempt at an Attachment in Chancery

under Miss. Code Ann. § 11-31-1 *et. seq.*

¶94. Attachment in Chancery is a pre-judgment remedy which serves as an involuntary dispossession of the defendant prior to any adjudication of the rights of the plaintiff. *Federal Sav. and Loan Ins. Corp. v. S. & W. Constr. Co.*, 475 So. 2d 145, 147 (Miss. 1985). Attachment is to strictly comply with the statutory norms and procedures when it is employed. *Id.*; *St. Paul Fire & Marine Ins. Co. v. Arnold*, 254 So. 2d 872, 873 (Miss. 1971). Miss. Code Ann. § 11-31-2 and 3 (Supp. 1997) are specific as to what must be done in order to obtain an effective Order of Attachment on property and must be followed closely. *Anderson v. Sonat Exploration Co.*, 523 So. 2d 1024, 1027-28 (Miss. 1988). No Order of Attachment was ever issued in the present case.

¶95. Grossnickle responds by asserting the chancellor's decision to impose a lien can be affirmed on the basis of the lis pendens notice. However, the chancellor did not find the lis pendens notice sufficient to impose a lien. Further, Grossnickle states that the chancellor reached the correct decision because the purchasers (TXG and Enron) had actual notice of Plaintiff's lien claim by virtue of being parties in the suit and actually receiving a copy of the Second Amended Complaint. According to Grossnickle, TXG cannot avoid enforcement of the lien remedy requested in the Second Amended Complaint, because that very complaint joined TXG as a party to this suit and gave TXG actual notice of Plaintiff's claims for a lien on San Gabriel's share of production before post-suit production resumed in April 1991.

¶96. TXG next argues the "law of the case" doctrine precludes the Plaintiff from raising a claim to a lien on the other 62.5% working interest at the accounting phase. TXG asserts that all of the Plaintiff's claims and issues were resolved by the 1993 Judgment. The only issues left, as stated by TXG, were "Plaintiff's claims for an accounting, and the questions as to what extent the Limited Partnership's Interest [37.5%] is subject to any costs or claimed liens." Therefore, the Plaintiff's attempt to resurrect this issue should be barred by the "law of the case" doctrine.

¶97. The law of the case doctrine, as recognized by this Court, is as follows:

> The doctrine of the law of the case is similar to that of former adjudication, relates entirely to questions of law, and is confined in its operation to subsequent proceedings in the case. Whatever is once established as the controlling legal rule of decision, between the same parties in the same case, continues to be the law of the case, so long as there is a similarity of facts. This principle expresses the practice of courts generally to refuse to reopen what has previously been decided. It is founded on public policy and the interests of orderly and consistent judicial procedure.

*Simpson v. State Farm Fire and Casualty Co.*, 564 So. 2d 1374, 1376 (Miss. 1990) (*quoting Mississippi College v. May*, 241 Miss. 359, 366, 128 So. 2d 557, 558 (1961)).

¶98. TXG argues that by not reserving the Plaintiff's claim to the 62.5% working interest, the chancellor ruled against such a right by necessary implication. However, TXG's citations involve res judicata. Res judicata only applies to final judgments. *E.g.* *State ex rel. Moore v. Molpus*, 578 So. 2d 624, 640 (Miss. 1991). Here there was not a final judgment until April 12, 1994, when the chancellor's Final Judgment was filed in the Holmes County Chancery Clerk's office. The accounting portion was the second phase to the trial that began in 1993.

¶99. The only issues submitted for trial in January 1993 were whether Plaintiff was the owner of a 37.5% interest in the Mississippi Property, whether San Gabriel held title to that interest in a constructive trust, and whether legal title to that interest should be vested in Plaintiff. The portion of the chancellor's opinion dealing with what was reserved for a later determination is as follows: "Plaintiff's claims for an accounting, and the questions as to what extent the Limited Partnership's Interest is subject to any costs or claimed liens, have been reserved by the Court for subsequent determination."

¶100. TXG's argument that the "law of the case" prevented the chancellor from assessing a lien on the 62.5% working interest is without merit. The only issue that was decided by the March 1993 judgment was the ownership of the 37.5% interest.

¶101. TXG next argues that the chancellor should not have created a lien in April 1994 on the other 62.5% working interest in the Smith Well because its owners were not debtors or parties to the suit. The Final Judgment created a lien on the other 62.5% working interest's future production proceeds in order to pay a judgment owed by San Gabriel for the 1985-88 production. In April of 1994, San Gabriel did not own any of the other 62.5% working interest.[(8)] The chancellor was made aware of that fact before entry of the Final Judgment.

¶102. TXG correctly argues to this Court that it was error for the chancellor to impose a lien on property no longer owned by San Gabriel. "A judgment, when enrolled in Mississippi, becomes a lien upon the property **of the defendant** within the county where the judgment is enrolled from the date of enrollment and priority is established from that day forward." *Simmons v. Thomas*, 827 F. Supp. 397, 401 (S.D. Miss. 1993) (*citing* **Herrington v. Heidelberg**, 244 Miss. 364, 141 So.2d 717 (1962)) (emphasis added). TXG interprets this to mean that the defendant actually had to own the property at the time the judgment lien was imposed.

¶103. When property is subject to an enrolled judgment and is subsequently purchased by a third party in this condition, it is held subject to the right of the creditor to subject it to his judgment. *Willis Hardware Co. v. Clark*, 216 Miss. 84, 93, 61 So. 2d 441, 442 (1952). In *Willis* the judgment creditor obtained a judgment against the judgment debtor. After the judgment had been enrolled, the judgment debtor sold fifteen bales of lint cotton to one Clark, who took possession of the cotton and converted it to his own use. The judgment creditor sued Clark for the value of the cotton. The holding of the case was that Clark, having disposed of the property, was not liable to the judgment creditor for a money judgment. *Brookhaven Bank & Trust Co. v. Gwin*, 253 F.2d 17, 21 (5th Cir. 1958) (explaining the Supreme Court of Mississippi's holding in *Willis*). The creditor did not have a writ of execution levied upon the cotton while it was in the hands of Clark so as to obtain a specific lien thereon, but waited until after Clark had disposed of the cotton and then sought to obtain a money judgment against Clark for the conversion of the cotton. *Id.* at 22.

¶104. According to Miss. Code Ann. § 11-7-191, "the lien follows the property and does not authorize a money judgment against a person who has disposed of the property." *Id.* "One who purchases property on which there is an enrolled judgment lien holds it subject to the right of the judgment creditor to have it seized under a writ of execution for the satisfaction of the judgment." *Id.* (*quoting* **Motors Securities Co. v. B.M. Stevens Co.**, 83 So. 2d 177, 179 (Miss. 1955)). In the present case, TXG received its rights and interests in the Smith Well prior to the imposition of a

judgment lien by the chancellor. The judgment was not even issued, not to mention enrolled, at the time TXG received its rights by assignment. The assignment took place in 1992, and the chancellor imposed the judicial lien in 1994.

¶105. Grossnickle responds by stating all claimed successors to San Gabriel had actual notice of the ongoing suit, and took their assignments after the Second Amended Complaint was filed on September 10, 1990. Milmac's December 18, 1990, agreement with San Gabriel recited the existence of the suit. The June 28, 1992, assignment from San Gabriel to Milmac, which created the reversionary interest in twenty individuals, stated that it was made in accord with and recited the existence and filing location of the December 18, 1990, letter. Empiric took its interest from those persons by assignments in October and November of 1992. The president and chief executive officer of Empiric is James L. Ling, formerly an officer of San Gabriel. Grossnickle asserts that none of these persons can claim to be purchasers without notice and in good faith. Also, Grossnickle states that TXG took its rights with knowledge and subject to this suit and to all of Plaintiff's claims.

¶106. TXG counters Grossnickle's notice argument by stating "one's notice of a claim--indeed one's actual notice of a judgment--has absolutely no effect on one's rights in property obtained from the judgment debtor prior to enrollment of the judgment lien." In construing the predecessor to Miss. Code Ann. § 11-7-191, this Court ruled it to be immaterial whether a third party had knowledge of the judgment. *Johnson v. Cole Mfg. Co.*, 144 Miss. 482, 489, 110 So. 428, 429 (1926). The Court stated:

> We are of the opinion that these sections give no lien until the judgment is enrolled; that it is the enrollment of the judgment that creates the lien; and that the judgment roll is not merely for the purpose of giving notice of a preexisting lien. There being no lien until the enrollment of the judgment on the property of the Johnson-Harlow Lumber Company, title passed by the deed of trust to the trustee and by the sale thereunder to Johnson. In other words, the Cole Manufacturing Company had no legal title or lien that affected the title, and **it is immaterial whether Johnson had knowledge of the judgment or not**. The judgment did not attach to the property under the circumstances stated.

*Id.* (emphasis added).

¶107. In *Kalmia Realty & Ins. Co. v. Hopkins*, 163 Miss. 556, 566, 141 So. 903, 904 (1932), KRIC took a judgment against Russell in August of 1929. On November 30, 1929, Hopkins acquired property from Russell. Hopkins filed his deed of record on December 3, 1929. The judgment was not enrolled until December 20, 1929.

> It is admitted that [Hopkins] caused the title to the lands to be investigated, and was advised that the record showed that the title was vested in the proposed vendor, free of all liens except a deed of trust in favor of the First National Bank of Meridian. The record shows that the appellee was a bona fide purchaser for value of the property long before the enrollment of the judgment, and consequently this property was not subject to levy and sale under an execution based on the judgment.

*Id.* TXG, therefore, asserts that notice is immaterial because a judgment lien cannot attach to property of the debtor until the judgment is enrolled.

¶108. The prior case law in this State allows a bona fide purchaser to take free and clear of the judgment. It would seem that a party with notice of a claim would take subject to that claim. However, the law is clear that a judgment does not take effect until it is enrolled. This judgment attaching to the other 62.5% interest, which was to take priority over all other claims, was not enrolled until April 12, 1994, when the Final Judgment of the chancellor was filed in the chancery clerk's office in Holmes County. Grossnickle only states that notice was given. There is no citation to any authority by Grossnickle that would rebut the citation by TXG. We find that the chancellor erred by imposing the lien on the other 62.5% interests.

¶109. Alternatively, if the chancellor did have the authority to create the judicial lien on the other 62.5%, TXG states he did not have sufficient authority to make the judgment lien superior to a previously perfected security interest or Milmac's contractual and statutory right to recover the costs of operating the well. This Court agrees and holds that the alternative argument of TXG still requires the chancellor's decision to be reversed and rendered.

¶110. Milmac received its interests and rights in the Smith Well from San Gabriel as established in three documents: the December 18, 1990, letter agreement, the March 18, 1991, supplemental agreement, and the assignment dated June 28, 1992. At the time San Gabriel executed these instruments, it still owned legal title to 100% of the leases and full title to 62.5% of the Smith Well unit and leases. All of these documents were filed no later than July 27, 1992, in the Holmes County land records.

¶111. Under these agreements, San Gabriel turned over possession of the Smith Well to Milmac and gave Milmac the specific right to receive and possess all production and proceeds from the Smith Well. These agreements satisfy the formal requirements for a financing statement as set forth in Miss. Code Ann. § 75-9-402 (1972). Milmac's security interest in the production and proceeds from the Smith Well became perfected when it took possession beginning in April 1991. Miss. Code Ann § 75-9-305(Supp. 1997).

¶112. TXG claims its rights in the Smith Well by way of the December 19, 1990, assignment from Milmac. It included proceeds from production until 100% of the costs advanced to restore the well to production had been recovered. Under that agreement, TXG became a partial assignee in all interest Milmac received from San Gabriel and has the same perfected security interest status. *See* Miss. Code Ann. § 75-9-302 (2)(Supp. 1997).

¶113. Therefore, any judgment lien imposed by the chancellor would be subject to the perfected security interests of Milmac and TXG.

> A person who becomes a lien creditor while a security interest is perfected takes subject to the security interest only to the extent that it secures advances made before he becomes a lien creditor or within forty-five days thereafter or made without knowledge of the lien or pursuant to a commitment entered into without knowledge of the lien.

Miss. Code Ann. § 75-9-301 (4)(Supp. 1997).

¶114. Grossnickle responds by stating TXG cannot claim that it was surprised by the Plaintiff claiming a lien on San Gabriel's share of post-May 1988 production and proceeds, when that was the

relief requested in the Second Amended Complaint. However, the judgment lien did not become binding or effective until it was enrolled. Therefore, TXG did not have notice of the lien prior to taking its interest in the Smith Well. The chancellor abused his discretion and authority under Mississippi law by attempting to prime the previously perfected security interest with the judgment lien issued two years later. The chancellor's decision is reversed and rendered as to this issue.

### VII. WHETHER THE CHANCELLOR PROPERLY DENIED TXG'S MOTION TO ALTER OR AMEND THE FINAL JUDGMENT TO PROVIDE THAT XENEREX PARTNER'S 37.5% WORKING INTEREST IN THE SMITH WELL BE SUBJECT TO ITS SHARE OF FUTURE OPERATING COSTS.

¶115. TXG claims the judgment lien issued by the chancellor should be subject to the payment of future operating costs attributable to the working interests to which the lien is attached. A working interest, as discussed earlier, includes the right to produce oil and gas, with the concomitant obligation to bear all of the costs associated with that right of production. If the working interest is not subject to the costs of production, it would become a royalty interest, as discussed earlier in this opinion. The "judgment creditor succeeds to only such rights in the judgment debtor's property as the judgment debtor actually has." *Candler v. Cromwell*, 101 Miss. 161, 170, 57 So. 554, 555 (1912). "The judgment creditor merely succeeds the judgment debtor; that is, takes his place and subjects the actual interest of the judgment debtor to his demand." *Id.* TXG further argues under Miss. Code Ann. § 53-3-7 (Supp. 1997) and the 1980 Order of Integration by the Mississippi State Oil and Gas Board, all interests in production from the Smith Well are subject to the operator's right to recoup all costs of operation.

¶116. Because the interests in the Smith Well were working interests, this Court holds that any lien attached to those interests does not take precedent over the type of interest in the well, by changing the very nature of the interest. In other words, TXG is correct in stating if the judgment lien is not subject to the future operating costs of the well, the interest is changed from a working interest into a royalty (non-cost bearing) interest. Thus, the chancellor should have amended his Final Judgment to provide that Xenerex's 37.5% working interest in the Smith Well be subject to its share of future operating costs. This issue is remanded with instructions for the chancellor to subject Xenerex's 37.5% working interest to its pro rata share of future operating costs when rendering the Final Judgment.

### VIII. WHETHER THE CHANCELLOR PROPERLY DENIED TXG'S MOTION FOR JOINDER AND SUBSTITUTION OF PROPER PARTIES PLAINTIFF, ESPECIALLY EMPIRIC ENERGY, INC.

### IX. WHETHER THE CHANCELLOR PROPERLY DENIED TXG'S REQUEST TO AMEND THE FINAL JUDGMENT TO REFLECT THE OWNERSHIP AND OBLIGATIONS OF EMPIRIC IN THE SMITH WELL AND LEASES.

¶117. By January 22, 1993, Empiric was a reversionary owner of the other 62.5% working interest and owner of 52.8% of the Xenerex 37.5% working interest. After the January 22, 1993, assignment from Plaintiff, DJN, Inc., Dean V. Grossnickle (individually), Albert Susman, and Empiric Energy, Inc. owned all of Plaintiff's interest in both the Smith Well and the outcome of the litigation. On January 6, 1994, TXG moved to either join or substitute those four owners under Miss. R. Civ. P. 19

and 25. On January 24, 1994, the chancellor overruled the motion stating:

> The Court's of the opinion that that [sic] motion should be overruled basically for two reasons.
>
> First, the motion is not timely in that the assignment of interest that the parties TXG now seeks to bring in were made a year or more ago. TXG makes no claim that the assignment of interest has only now come to its attention. In fact, the assignments of Stasio, Martin, and Pettigrew were introduced in the trial of this cause a year ago as Exhibits 69, 70, 71.
>
> Furthermore, the Court is of the opinion that the Joinder of Plaintiff's Successors in Interest is not needed in order to facilitate the conduct of this action, or to enable the Court to enter a Judgment which is binding on the Plaintiff's successors in interest.
>
> Section 25(c) of the Mississippi Rules of Civil Procedure expressly grant to the Court the power to continue an action, even though there are subsequent transfers of interest. The comment to that rule provides that any judgment entered is binding on the successors in interest to the named parties

¶118. It is the January 22, 1993, assignment from the Plaintiff of the Smith Well, the leases, and all interest in the litigation, which gave Empiric ownership of the Smith Well and leases. This assignment did not take place until after the first trial. TXG claims there is nothing in the record to indicate that Plaintiff made TXG aware of the assignment. TXG states it discovered the assignment in the public records of Holmes County months later, while preparing for trial on the accounting phase of this matter.

¶119. Miss. R. Civ. P. 19 (a) requires a person to be joined as a party if feasible:

> A person who is subject to the jurisdiction of the court shall be joined as a party in the action if:
>
> (1) in his absence complete relief cannot be accorded among those already parties, or
>
> (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.
>
> If he has not been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant or, in a proper case, an involuntary plaintiff.

Empiric, as owner of certain percentages in the working interests in the Smith Well and interests in the litigation, is a necessary, indispensable party under the above rule. *See **Ladner v. Quality Exploration Co.***, 505 So. 2d 288, 290-91 (Miss. 1987) (undivided mineral interest owners were deemed necessary, indispensable parties to any action by landowners against mining company for subsurface damage).

¶120. Because Empiric, DJN, Grossnickle, and Susman all acquired their interest by transfer from the

Plaintiff after the suit was filed, Miss. R. Civ. P. 25 (c) applies. However, both rules are to be viewed together, and not as one trumping the other. In *Johnson v. Weston Lumber & Bldg. Supply Co.*, 566 So. 2d 466, 469 (Miss. 1990), this Court held that a transferee, who obtained his interest in the property just a little more than a month before the chancellor's judgment was rendered, was an indispensable party and should be joined under Miss. R. Civ. P. 19 (a). Likewise, this Court holds that Empiric was an indispensable party and should have been joined upon TXG's motion on January 6, 1994.

¶121. Empiric's interest in this case is substantially different from the other successors to Xenerex. It was not represented by Plaintiff's attorney. It was also a successor to San Gabriel's interest in the other 62.5% working interest. Empiric was created and run by the same person who signed the agreements on behalf of San Gabriel to induce Milmac and TXG to fund restoration of the Smith Well beginning in December 1990. Empiric was willing to waive service of process and stipulate that any interest it succeeded to out of Xenerex was also subject to the right of Milmac and TXG to recover costs.

¶122. TXG asserts the chancellor's refusal to make Empiric a party in this case prevented complete relief and subjected TXG to a substantial risk that Empiric's 52.8% share of Xenerex's 37.5% working interest will now not be subject to any restoration costs, even though Empiric has admitted that it should. Empiric, as a reversionary owner of the other 62.5% working interest, has a substantial stake in the chancellor's determination that its interest is now subject to a lien in favor of the Plaintiff.

¶123. The chain of title from the Plaintiff to Empiric was admitted into evidence by the chancellor and is essentially undisputed. A waiver of process, a deposition, and a stipulation all given by Empiric made it clear that Empiric admits that its share of Xenerex's 37.5% working interest should be subject to Milmac and TXG's right to recover costs they incurred in restoring and operating the Smith Well after December of 1990.

¶124. Grossnickle responds that only TXG moved to have Empiric joined as an indispensable party under Miss. R. Civ. P. 19. The assignments make an express reference to the pendency of this litigation. However, none of those assignees ever sought, on their own, to join this case, according to Grossnickle.

¶125. Grossnickle makes an argument that TXG did not make a timely motion to join Empiric under Miss. R. Civ. P. 19. Grossnickle asserts TXG knew about the assignments to Empiric since at least the January 1993 trial, where they were introduced into evidence. The January 1993 assignment by Plaintiff was recorded on January 25, 1993. However, the record does not contain the assignment to Empiric.

¶126. Grossnickle distinguishes *Johnson*, by stating the Court actually held a post-litigation transferee who seeks to be joined under Rule 19 and demonstrates that he is a necessary party should be joined. He summarizes his argument by stating TXG "needs" Empiric as a party, not to facilitate the end of the case, but rather to delay the case.

¶127. Procedural due process requires that parties who have rights that will be affected are entitled to be heard. *Aldridge v. Aldridge*, 527 So. 2d 96, 98 (Miss. 1988). It is then elementary that it would be a violation of due process for a party whose rights are to be affected to not be heard. However, TXG

was the moving party attempting to join Empiric under Miss. R. Civ. P. 19. Empiric was apparently amicable to being joined; yet, it did not make a motion on its own to be joined. Because this Court finds that Empiric should have been joined as a party under Rule 19 as a result of the undue burden placed on TXG, we do not reach the assignment of error under Miss. R. Civ. P. 25. The chancellor abused his discretion in denying such joinder as requested. On remand, Empiric should be joined as a party to this action under Miss. R. Civ. P. 19.

### X. WHETHER THE CHANCELLOR'S FAILURE AND/OR REFUSAL TO MAKE FINDINGS OF FACT AND CONCLUSIONS OF LAW ON ISSUES IV.--IX., ABOVE, IS REVERSIBLE ERROR.

¶128. TXG asserts the chancellor abused his discretion in failing to make adequate findings of fact and conclusions of law for the imposition of the lien and why it was to be superior to previously perfected security interests. TXG states the chancellor ignored its specific request for additional findings "setting forth the basis for the imposition of such a lien." TXG contends that because of this request, the chancellor was required to set forth the factual and legal basis for creating such a lien. Miss. R. Civ. P. 52. It goes without saying that this case is extremely complex, and highly contested with numerous factual issues in dispute, as attested by such a lengthy opinion.

> [I]n cases of any complexity, tried upon the facts without a jury, the Court generally should find the facts specially and state its conclusions of law thereon.

> As in other areas, we will not interfere with a trial court's exercise of its discretion unless that discretion be abused. Where, however, a case is hotly contested and the facts greatly in dispute and where there is any complexity involved therein, failure to make findings of ultimate fact and conclusions of law will generally be regarded as an abuse of discretion.

*Tricon Metals & Services, Inc. v. Topp*, 516 So. 2d 236, 239 (Miss. 1987). This Court remanded in that case for the chancellor to make findings of fact separately from it conclusions of law.

¶129. Grossnickle responds that TXG's objection is unmerited by claiming generalized findings of fact and conclusions of law are technically sufficient under Miss. R. Civ. P. 52 (a). TXG cites the holding in *Lowery v. Lowery*, 657 So. 2d 817 (Miss. 1995), where this Court held the trial court must provide findings of fact and conclusions of law upon request when the court fails to even make a generalized finding of fact and conclusions of law.

¶130. Where "there are no specific findings of fact, this Court will assume that the trial court made determinations of fact sufficient to support its judgment." *Century 21 Deep South Prop., Ltd. v. Corson*, 612 So. 2d 359, 367 (Miss. 1992). The chancellor in his March 8, 1993, Opinion stated in one paragraph his reasons for imposing the lien. In *Lowery*, we further interpreted our holding in *Corson*, stating "a court has technically complied with the mandates of Rule 52 where it makes general findings of fact and conclusions of law although requested by a party to make specific findings." *Lowery*, 657 So. 2d at 819.

¶131. The Court finds the chancellor made a sufficient generalized finding of fact in his opinion and did not abuse his discretion in failing to make specific findings of fact. He was correct in complying with Miss. R. Civ. P. 52 under the holdings of this Court at the time. The chancellor did not have the

benefit of the *Lowery* decision, as it was decided in 1995, since the chancellor rendered his opinion in 1994. This case is to be remanded on other issues and the Court finds there were no special findings of fact by the chancellor. Therefore, because the facts and issues are so convoluted and complex, this Court instructs the chancellor on remand to make separate and specific findings of fact and conclusions of law.

## CROSS-APPEAL

**I. WHETHER THE LOWER COURT ABUSED ITS DISCRETION BY EXCLUDING PLAINTIFF'S EVIDENCE OF THE VALUE OF THE NATURAL GAS PRODUCED AND SOLD FROM THE GAS WELL AT ISSUE DURING THE PERIOD FROM 1985 UNTIL 1988, AND DENYING PLAINTIFF A JUDGMENT FOR THAT AMOUNT OF MONEY.**

¶132. Following the trial, the court ruled that Exhibit 104 was not admissible as to gas values:

> Mr. Grossnickle estimated the average value of the gas to be 4[7]½ cents per MCF, but he admitted to having no knowledge of the value of gas or what price San Gabriel received during the period. He rested his estimate solely on the price of gas as agreed upon in gas contracts executed between TXG and San Gabriel after 1988. This evidence, even if uncontroverted, was entirely too speculative to support a judgment.

¶133. Where it is reasonably certain that some damage happened, the recovery of damages is not precluded by uncertainty as to amount. *Nichols*, 485 So. 2d at 1038. Grossnickle asserts *Wall v. Swilley*, 562 So. 2d 1252, 1255 (Miss. 1990), as authority for proof of value of a commodity is not inadmissible because the proof relates to the commodity's value as of a different date than the date at issue in the case; the "time gap" goes to the weight of the evidence, not the admissibility.

¶134. Grossnickle's opinion as to a fair and reasonable price was based on his personal knowledge of the prices which were paid for gas produced from the Smith Well after May 1988, 47.5 cents per MCF. TXG put on evidence of the actual prices paid for gas produced by the Smith Well from 1985 to 1988:

> Q. You said during the course of that, you reviewed gas contracts, one or more gas contracts, which showed you that the price which had been paid for gas prior to that was what?
>
> A. To my best recollection, it was 37-and-a-half cents out of the Smith Well, for MCF.
>
> Q. You are here to tell the Court that you acquired some knowledge that the prices paid prior to 1990 were 37-and-a-half cents?
>
> A. To the best of my recollection--I do not have the old contracts with me, but to the best of my recollection, we started out with a higher price of 40 cents. It was up by 2-and-a-half cents.

¶135. Grossnickle asserts that the evidence was admissible under *Swilley*, and also as testimony by an owner. *E.g.*, *Thomas v. Global Boat Builders & Repairmen, Inc.*, 482 So. 2d 1112, 1116 (Miss. 1986). He also claims that because of San Gabriel's refusal to answer discovery the evidence from the old contracts was the only gas pricing information that he had, and he should be afforded more

discretion. Rehm testified from his personal knowledge that 37 ½ cents was the contract price, at a time prior to 1990, for gas purchased from the Smith Well. Grossnickle argues that it was error for the chancellor to exclude Exhibit 104 as to gas prices.

¶136. Grossnickle's arguments are misplaced and without merit. First, in *Swilley* testimony was allowed by an expert real property appraiser. *Swilley*, 562 So. 2d at 1255-56. It does not support the lay testimony of an admitted non-expert like Grossnickle. Therefore, Grossnickle should have had personal knowledge of gas prices from 1985-88. He did not have such personal knowledge and only testified as to gas contracts post-1988. This Court holds that his testimony was correctly excluded based on this reason alone.

¶137. Second, TXG argues that Rehm's testimony as to his recollection of a review of written gas purchase contracts was inadmissible hearsay. TXG claims that Rehm's testimony as to a price for some unspecified, undefined time "prior to May 1990" is far from specific enough to establish the price paid for gas from 1985-88. TXG asserts that this, at best, impeaches Grossnickle's testimony.

¶138. TXG's second argument as to hearsay is without merit. Gary Rehm was called to testify by TXG. He was the director of facilities at TXG. There was no objection made at trial as to his testimony. "In order that there be preserved error for this Court to review, there must be a contemporaneous objection." *Holt v. State*, 650 So.2d 1267, 1271 (Miss. 1994). At no time did TXG ever offer an objection to the testimony of Rehm.

¶139. Rehm testified that he was the director of marketing for TXG Gas Marketing Company. All of the testimony of Rehm was an admission by a party opponent under Rule 801(d)(2) of the Miss. R. Evid.[9] Miss. R. Evid. 801(d)(2)(D) provides that a statement made by an agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship is an admission of the party. TXG cannot be allowed to claim testimony of Rehm, who was its director of facilities and director of marketing at the time of his testimony, was hearsay just because TXG does not agree with the content of his testimony. It was clearly an admission by an agent or servant (employee) of TXG at the time of his employment. TXG qualified his position in the preliminary questioning of Rehm. TXG should have known the stance and content of Rehm's testimony prior to calling him to the stand.

¶140. This Court holds that the testimony of Rehm was admissible as an admission by a party. However, it is irrelevant and moot as the testimony of Grossnickle was properly excluded by the chancellor. Grossnickle's assignment of error on the cross-appeal is without merit.

## CONCLUSION

¶141. This case is fact intensive and the issues are convoluted. The chancellor committed reversible error by not considering the costs incurred by TXG to restore the Smith Well during the accounting phase of the trial. The testimony by Grossnickle as to the value of oil produced from 1985-88 was insufficiently reliable to be considered in rendering the judgment against TXG. As this case is to be remanded for a new trial to allow consideration of the costs incurred by TXG, evidence sufficient to enable the trier of fact to make a fair and reasonable estimate as to the amount of damage will have to be submitted to the trier of fact.

¶142. The chancellor did not have the authority to create a lien in the other 62.5% working interest to take precedent over the interests already vested in other parties. The judgment lien did not become binding until it was enrolled. In the case sub judice, the lien was not enrolled until after the interests in the third parties became vested. The chancellor erred by imposing the lien on the other 62.5% interest, and his decision thereon is reversed and rendered.

¶143. The chancellor abused his authority by attempting to prime TXG's previously perfected security interest in the Smith Well from 1992 by imposing a judicial lien in 1994. Milmac had met the requirements for perfection of a security interest in the Smith Well at the latest in 1992. The judgment lien did not take effect until the chancellor rendered his Final Judgment in 1994. Therefore, when TXG received its rights in the Smith Well by way of assignment from Milmac in 1990, it was impossible for TXG to have known about a lien that did not exist at that time.

¶144. The chancellor should have amended the final judgment to provide that the Xenerex 37.5% working interest in the well should be subject to its pro rata share of future operating costs. If the working interest is allowed to escape the burden of cost of production, it will be changed from a working interest into a royalty interest.

¶145. The chancellor committed error by not joining Empiric Energy as a party to the suit. Empiric's rights in the property interests that it had acquired were clearly affected by the judgment rendered by the chancellor. Although TXG made the motion for joinder and not Empiric, Empiric's due process rights were violated when the motion was denied. Alternatively, TXG would suffer an undue burden by bearing greater costs than it should if Empiric is not joined to this action. On remand this Court directs the lower court to join Empiric as a party to this action.

¶146. TXG's contention that the chancellor abused his discretion for not having made adequate findings of fact and conclusions of law is without merit. According to *Lowery*, Miss. R. Civ. P. 52 (a) has been complied with if generalized findings of fact and conclusions of law have been made by the chancellor. Since this case is to be remanded on other issues, and considering the complexity of the factual and legal issues involved, we direct the chancellor on remand to make separate and specific findings of fact and conclusions of law.

¶147. On the cross-appeal, Grossnickle's assignment of error is without merit. His testimony as to gas prices during the period of 1985-88 was properly excluded from evidence because he had no personal knowledge of the prices during that time frame. He testified as to prices subsequent to 1990. The chancellor's decision is affirmed as to the cross-appeal.

¶148. **ON DIRECT APPEAL: REVERSED AND RENDERED IN PART; REVERSED AND REMANDED IN PART. ON CROSS-APPEAL: AFFIRMED.**

**PRATHER AND SULLIVAN, P.JJ., PITTMAN, BANKS, McRAE, SMITH AND MILLS, JJ., CONCUR. LEE, C.J., CONCURS IN RESULT ONLY.**

1. That footnote reads as follows:

It is notable that TXG does not claim that it can recover the 100% penalty which San Gabriel promised Milmac and which Milmac agreed to divide with TXG. That is, of course, because that penalty is a <u>finance charge</u> which, even if paid, neither San Gabriel nor any other party can charge to the limited Partnership's interest. *See **Pursue Energy Corp.***, 524 So. 2d at 571-72 (holding that interest expense is not a required cost of operation). (emphasis in original)

2. Included was a letter from San Gabriel which stated:

Following is information received from Milmac Operating Company (operator of the Smith Well since May 1990) showing total costs related to the well of $825,067.88 through 1991 [sic] . We are still trying to get cost figures from them for 1992 and 1993.

Under the agreement with Milmac, they recover 200% of their costs, before San Gabriel (and its successors and assigns) participate in revenues. Accordingly, through 1991, Milmac would be entitled under the agreement to recover $1,650,135.76 (subject to audit of their costs).

3. 2. Under the terms of the letter agreements dated December 18, 1990, December 19, 1990, and June 6, 1991, of which this Court is familiar, TXG agreed to pay Milmac for the costs of certain repairs, reworking and improvements to the Smith Well in exchange for an assignment of 100% of San Gabriel's interest in the well which had previously been assigned to Milmac. Additionally, TXG is the purchaser of natural gas from the well.

3. Under Mississippi law, amounts paid by TXG for the purchase of natural gas are first applied to recoup expenses necessary to cause the well to be capable of production before the Plaintiff is entitled any revenue from the well. Since these costs have not yet been recovered, the Plaintiff has no right to any revenue attributable to its interest. *See **Mills v. Damson Oil Corp.***, 931 F.2d 346, 349-50 (5th Cir. 1991).

4. Both TXG and Milmac take the position that although Xenerex Partners, Ltd. has been adjudicated the owner of 37.5% interest in the Smith Well, that interest is subject to its proportionate share of the operating costs and reworking costs of the well. As a co-tenant with the other working interest owners, they should not receive any revenue from the well until their proportionate share of the costs have [sic] been paid.

5. TXG claims that, based on one or more letter agreements which it claims to have with Milmac Operating Company ("Milmac"), Milmac is entitled to receive the proceeds. The existence of and the extent to which someone may claim to have a lien on production proceeds are issues in this case. R.E. 357.

6. IT IS FURTHER ORDERED that Defendants shall provide Plaintiff with an accounting for all production, proceeds from production, and claimed costs and liens relating to the Limited Partnership's Interest, said accounting to be provided to Plaintiff's counsel within thirty (30) days from the date that this Judgment is entered. The parties are then granted sixty (60) days from the date that the accounting is provided in which to confer, exchange information, and documents and conduct discovery on any questions relating to the accounting and whether and to what extent the Limited Partnership's Interest may be subject to any claimed costs or liens. The Court will then set a date to hear and resolve the remaining claims and issues.

7. The reasons were as follows:

1) The proposed amendment will result in delay and additional issues and claims being raised.

a) Additional pleadings would be required in response to the amendment, such as Plaintiff's answer and defenses to the proposed counterclaim.

b) Plaintiff would have a right to discovery on TXG's new defenses and counterclaim.

c) The court would need to hear and decide Plaintiff's Motion (filed January 17) which seeks to exclude evidence on the new defenses and counterclaim because of TXG's insufficient and non-responsive discovery answers filed on January 10. Alternatively, the Court would have to order TXG to provide meaningful answers.

d) The amendment would apparently [sic] allow TXG to take the proposed deposition of Empiric Energy, notwithstanding the apparent irrelevance of the proposed testimony ("Empiric agrees with TXG, etc.")

2) The proposed amendment will deprive Plaintiff of the benefits of the October 1993 Order which prohibits San Gabriel (and, we submit, its successors) from introducing any evidence of any claimed costs and liens relating to the interest in question.

3) The proposed amendment will deprive Plaintiff of meaningful notice of and discovery on TXG's defenses and counterclaim, not to mention the notice and discovery Plaintiff is entitled to under the Rules.

a) The only party who has previously asserted any claim of recoupment is San Gabriel, per a defense of recoupment in its 1990 answer. Accordingly, Plaintiff concentrated his discovery efforts on San Gabriel. Those efforts resulted in the October 1993 Order which, because of San Gabriel's failure to comply with its terms, prohibits San Gabriel (and its successors) from introducing any evidence of any claimed costs and liens relating to the Limited Partnership's Interest.

b) No one else has asserted the defenses and claims wh ich TXG now seeks to assert. For example, in October 1991, Plaintiff took TXG's deposition, and in June 1993, Plaintiff obtained TXG's answers to discovery requests. **In neither of those discovery exercises did TXG assert any of the defenses and claims it now seeks to assert.**

c) The Court's March 1993 Judgment put TXG on notice that the Court would take up "Plaintiff's claims for an accounting," and "whether and to what extent the Limited Partnership's Interest may be subject to any claimed costs or liens."

d) **In June 1993, TXG filed discovery answers stating (under oath) that TXG "has no information concerning the costs and expenses of the Smith Well."** TXG's Answer to Inter. No. 40. At no point in any of those answers did TXG make or disclose that it had any claim or lien for well costs. TXG clearly was taking a "hands off" position on the issues of whether and what were the claimed costs and liens relating to the Interest, and who claimed to be owed.

e) In **June 1992**, San Gabriel assigned all of its interest to Milmac for a term until Milmac has recovered 200% of the well costs. Milmac, however, never has sought to join this case or assert any claim or lien, perhaps content with a 200% cost recovery out of San Gabriel's 62.5% interest. Under Rule 25(c), it was not necessary for Milmac to move to join this case, or for anyone else in the case to join Milmac involuntarily. As a successor to a party to the suit (San Gabriel), Milmac has been bound by all of the **prior and subsequent** proceedings in this case (e.g., discovery requests to San Gabriel, San Gabriel's "answers," the March 1993 Judgment, and the October 1993 Order). **TXG, as a claimed successor to San Gabriel and Milmac, is in no better position to assert new defenses and a counterclaim than is San Gabriel or the silent Milmac.**

(emphasis in the original).

8. By assignment dated June 28, 1992, San Gabriel assigned all of its right, title and interest in the Smith Well and the Mississippi Properties to Milmac, until 200% of the costs had been recouped, then to 20 parties identified in Exhibit C to the Assignment. The assignment has been filed of record since July 1992. In October and November, 1992, Empiric subsequently acquired the interest of all 20 reversionary owners.

9. The comment to Rule 801(d)(2) provides in pertinent part:

(C) The general principle survives that a statement by an agent authorized to speak by a party is tantamount to an admission by a party. . . .

(D) The common law required that the agent's statement be uttered as part of his duties, i.e., within the scope of his agency. 801(d)(2)(D) regards this rigid requirement and admits a statement "concerning a matter within the scope of his agency" *provided* it was uttered during the existence of the employment relationship. (emphasis in the original).