30 So.3d 290 (2009)
J. K.
v.
R. K.
No. 2008-CA-01026-SCT.
Supreme Court of Mississippi.
August 13, 2009.
Rehearing Denied October 22, 2009.
*291 John Benton Clark, Thomas Ray Julian, Jackson, attorneys for appellant.
Thomas W. Crockett, Jackson, Carlton W. Reeves, attorneys for appellee.
EN BANC.
PIERCE, Justice, for the Court.
¶ 1. This case presents the second appeal to this Court in the domestic-relations dispute between R.K. and J.K. on an issue regarding a portion of the property settlement agreement incorporated in the divorce decree granted on August 29, 2002. In R.K. v. J.K., 946 So.2d 764 (Miss.2007), this Court reversed and remanded in part, with instructions, the chancery court's decision denying R.K.'s request for relief provided by Rule 60(b) of the Mississippi Rules of Civil Procedure. On May 20, 2008, the chancery court granted R.K. that relief from the court's previous judgment on the basis of double recovery and entered a final judgment in accordance with this Court's ruling.
¶ 2. J.K. timely appeals, assigning as error the chancery court's decision granting R.K. relief under Rule 60(b). Upon further consideration, having reviewed the full and complete record now before this Court, we find clear error in our previous ruling, thus requiring the reversal of the chancery court's May 20 final judgment.

*292 FACTS
¶ 3. The pertinent facts were stated in R.K. v. J.K., 946 So.2d 764 (Miss.2007), this Court's first opinion in this case.
¶ 4. R.K. and J.K. married in 1976. They had two children, L.K. and B.K., and the family resided in Hinds County, Mississippi, until 2001, when the couple separated and R.K. subsequently filed for a divorce. J.K. planted a recording device in R.K.'s car, which recorded R.K. talking at various times with other health professionals concerning patients and with lawyers regarding his personal legal matters as well as the matters of others in which he served as a medical expert. Upon learning of these recordings, R.K. filed a Motion for Injunctive and Other Relief and subsequently a Motion to Quash, both in May 2002, to prevent J.K. from ever using or divulging the information on the tapes. Later that May, the trial court granted in part R.K.'s motion for injunctive relief, instituting a preliminary injunction enjoining J.K. from admitting as evidence any of the recorded communications protected by the doctor-patient privilege. While the court did not quash the recorded communications, the court enjoined J.K. from using any of the recordings until the court could determine whether the communications should be quashed pursuant to 18 U.S.C. § 2511(1)(b)(I). R.K. filed a motion to reconsider, which the court denied. The parties agreed on their own terms as to the regulation of the information on the tapes in the divorce settlement agreement.
¶ 5. The court issued a final judgment of divorce on August 29, 2002, on the ground of irreconcilable differences, including the parties' agreement for property settlement and child support.
¶ 6. Section 11 of the agreement, titled "Installment Payments," provided in the first paragraph that R.K. would pay J.K. periodic alimony for four months, commencing as monthly payments of $5,000 on September 1, 2002, and thereafter, a lump-sum property distribution in monthly payments of $5,000, commencing on January 1, 2003, for fifty-six months, totaling $280,000. The second paragraph of section 11 allowed R.K. to "deduct one half of his cost of defending, settling, or discharging claims arising from his actions which took place prior to the date of the divorce." One of the three types of claims to which this deduction privilege applied was for "any litigation that may arise as a result of J.K.'s instigation, encouragement, or in which J.K. provides assistance, directly or indirectly."
¶ 7. Section 19 of the agreement, titled "Additional Covenants," required, inter alia, that J.K.:
(2) will return to [R.K.] all tapes, photos, and any other evidence or material she has in her possession concerning [R.K.]'s or any of his associates' conduct, and all copies, transcripts thereof or other reproductions thereof, (3) will keep confidential and not divulge to anyone any of the content or evidence derived from the use of the materials listed in clause (2), and promptly advise him of any accidental disclosure, (4) agrees not to pursue any litigation, civil or criminal relative to his relationship with other women, and in general will refrain from making any comments to anyone concerning [R.K.'s] alleged marital misconduct, except in counseling which is confidential.
¶ 8. Later in the same paragraph, J.K. and R.K. additionally agreed to the following:
J.K. warrants that she will not divulge the contents of the tapes to anyone. ... If Defendant breaches this Agreement in regards to the tapes, she will pay in liquidated damages the greater of (1) all amounts remaining due hereunder, or *293 (2) One Hundred Thousand Dollars ($ 100,000).
¶ 9. On December 17, 2002, C.G., longtime friend and legal counsel to R.K., filed suit [in federal court] against J.K. for wiretapping fraud, alleging that her recordings included his conversations with R.K. On December 12, 2003, J.K. filed a Petition to Re-Open and Modify Divorce Settlement and Court Order for a Limited Purpose in chancery court, requesting that the court modify the Agreement in such a manner as to allow her to defend herself. R.K. filed a Motion to Dismiss, Answer to Petition and Counter-claim for Contempt and Specific Performance on March 12, 2004. The counterclaim requested that the court find J.K. in contempt, inter alia, for violating section 19 by disclosing the contents of the tapes, and consequently, that the court order specific performance of the liquidated damages provision in section 11, which would require J.K. to forfeit the remaining $ 215,000 due of the property distribution lump sum. R.K. offered no evidence of his actual damages. The chancery court denied J.K.'s motion on March 31, 2004, finding that the tapes certainly were discoverable but leaving the determination as to whether J.K. could disclose the contents to the federal district court, which was in the best position to decide what information was necessary for disclosure in the wiretapping suit. The court did not address R.K.'s counterclaim for breach of contract at that time.
¶ 10. J.K. counterclaimed in federal court against C.G. on April 2, 2004, for conspiracy, abuse of process, and conversion, and R.K. intervened in the suit on April 12, 2004, consequently making him subject to J.K.'s counterclaim as well. On July 7, 2004, J.K. filed in the federal district court a Motion for Partial Summary Judgment as to the admissibility of certain tapes, treated by the court as a Motion in Limine. J.K. asked the court to rule that the Agreement could not be used to prevent her from defending herself in the wiretapping suit. On September 14, 2004, the federal district court granted J.K.'s motion.
¶ 11. J.K. was the only person who the court was certain knew the content of the tapes, thus her testimony was crucial in defense to the wiretapping suit. Since the wiretapping suit was based upon the content of the tapes, it was necessary for J.K.'s defense that she be able to discuss the information on the tapes. Thus, the court granted J.K.'s motion, holding that, solely within the context of that trial, J.K. could discuss the tapes in order to defend herself in the wiretapping suit. The court would address matters concerning evidentiary privileges as the need arose. The court did not decide whether J.K.'s arguments could be construed as "uses" or "disclosures" in violation of the Agreement and left that issue to be decided by the chancery court. On February 17, 2005, the jury found that J.K. had proven two of her claims, conversion and abuse of process.[1] The jury also found that she had suffered actual damages as a result of R.K.'s actions and consequently awarded her $242,000.
¶ 12. R.K.'s attorney wrote J.K. a letter in May 2004, stating that he had advised R.K. to discontinue monthly property-distribution payments in order to recoup his legal fees pursuant to Section 11 of the Agreement. On May 21, 2004, J.K. filed a Motion for Contempt and for Specific Performance of Property Settlement Agreement, requesting that R.K. be found in contempt for ceasing monthly property-distribution payments and that he be required to provide specific performance of *294 his duty per the Agreement to pay arrears and continue payments.
¶ 13. On November 15, 2004, the chancery court responded to J.K.'s motion for contempt and specific performance and R.K.'s counterclaim for breach of contract. The court found R.K. in contempt for willfully and intentionally violating the Agreement by failing to make the $5,000 monthly payments. The court did not enforce the liquidated-damages provision in section 19. She enforced the provision as a termination clause, finding "[J.K.] did not commit a material breach," as any disclosure was for a limited purpose among parties who already were aware of the content; and that, because of the necessity of participating in her own defense, her breach was not willful and thus not contemptuous. The court was thus unconvinced by R.K.'s argument that he had withheld the payments because J.K. had violated sections 11 and 19 of the Agreement by divulging the contents of certain tapes and making comments concerning R.K.'s alleged marital misconduct. The court found that R.K. had shown no actual damages as a result of the disclosure and found the $ 1 million damages amount excessive. R.K. was ordered to pay $35,000 in arrears and to continue the $5,000 monthly payments as provided by the Agreement. Additionally, because R.K. was found to be in contempt, the court granted J.K. attorney's fees as she requested.[2]
¶ 14. On November 22, 2004, R.K. filed a Motion for Clarification And/Or Reconsideration of November 15, 2004 Opinion, claiming that J.K. should be found in contempt, the liquidated damages provision in the Agreement enforced, and R.K. awarded attorney's fees pursuant to the Agreement. He contended that the penalty upon breach of the Agreement applied to each breach, citing eleven breaches in total, stating his claimed damages at $1.1 million. R.K. contended that, because it was his contractual right to deduct one-half of his attorney's fees from the balance of any sum due J.K., he should not be found in contempt. In response to R.K.'s motion, on February 18, 2005, the court reversed its finding that R.K. was in contempt for deviating from the Order by discontinuing his $5,000 monthly payments to J.K., citing the inequitable result of imposing a finding of contempt and award of attorney's fees against R.K. and not J.K. The Court also reversed the order for R.K. to pay J.K.'s attorney's fees.
¶ 15. On March 25, 2005, R.K. filed a Motion For Rule 60(b) Relief From November 15, 2004 Order And/Or Stay of Execution Of Order Pending Appeal, requesting, inter alia, that the court alter its November 15, 2004, order to award him liquidated damages pursuant to Section 19 and allow him to recoup half of his attorney's fees pursuant to Section 11. In the alternative, he requested that the court stay the execution of the November 2004 and February 2005 orders, awaiting the resolution of the action in federal district court or pending the appeal of the matter to this Court. On June 10, 2005, the chancery court issued a Final Order and Opinion of the Court in response to J.K.'s Motion for Citation For Contempt and on R.K.'s Motion For Rule 60(b) Relief From November 15, 2004 Order And/Or Stay of Execution Of Order Pending Appeal. After having heard testimony and considered the motions, the court stated that R.K. had provided inadequate grounds to warrant alteration or amendment of the opinion and reiterated its findings in the February *295 18, 2005, Order that R.K. was not in contempt for discontinuing payments to J.K., but must pay arrears and continue payments.
¶ 16. R.K. appealed the court's November 2004 and February 2005 orders on June 28, 2005, and J.K. filed a cross-appeal in response to the same orders on July 12, 2005. R.K. v. J.K., 946 So.2d at 768-771.
¶ 17. This Court reversed the chancery court and remanded on the issue of Mississippi Rule of Civil Procedure 60(b) relief, finding that the $242,000 award J.K. had received in federal court from her successful suit for conversion and abuse of process, if affirmed on appeal by the Fifth Circuit, subjected R.K. to multiple judgments and would result in a double recovery for J.K. Id. at 777. On remand, at the direction of this Court, the chancery court issued the following ruling:
This Court has reviewed the information in the record regarding the amount for each individual claim for damages; however, this Court cannot access the amount allocated for each of J.K.'s claim for damages. This Court hereby finds that there is insufficient information in the record to determine the amount awarded to J.K. for each claim for damages. Since J.K.'s judgment against R.K. in the amount of $242,000 has been affirmed by the Fifth Circuit, and there is insufficient information in the record to determine the amounts allocated to J.K.'s claim for damages, this Court is persuaded that R.K. must be granted relief from its judgment in order to prevent double recovery. Accordingly, this Court hereby denies J.K.'s Motion to Enforce this Court's November 15, 2004 Order.
¶ 18. This was error.

ANALYSIS

I. Law of the Case.
¶ 19. J.K. avers the chancery court erred in finding the record lacked sufficient evidence of her federal-court damages and saddling her with the burden of proof on R.K.'s motion for Rule 60(b) relief. J.K. contends that she received no award for the actual property-distribution payments owed to her in accordance with the property-settlement agreement, but rather was awarded "consequential" damages which resulted from R.K.'s conversion of the property-settlement payments. J.K. maintains that, through her testimony in federal court, she clearly identified the incidental damages she incurred as a result R.K.'s having tortiously, via abuse of process, converted the property-distribution payments; thus, there was sufficient evidence showing that the federal jury award was solely for "consequential" damages.
¶ 20. R.K. argues, however, that these issues previously were decided by this Court on the first appeal. The result of the chancery court's decision was in keeping with the instruction of this Court that a party cannot change a contract claim to a tort claim by simply giving it the name "conversion," thus giving double recovery for the same monetary loss. The chancery court's decision in effect held that the satisfaction of the federal-court judgment included payment of $200,000 for the claims related to nonpayment of debt and $42,000 for all other damages.
¶ 21. The points of contention raised by J.K. on this appeal were passed upon by this Court on the first appeal. Therein, a majority of this Court held that "allowing J.K. to recover the chancery court judgment for property distribution payments as well as the federal court judgment for conversion of those same payments would be contrary to this state's policy against *296 multiple recoveries for the same damages." R.K. v. J.K., 946 So.2d at 777. On that finding, this Court mandated that R.K. be granted Rule 60(b) relief from the chancery court's previous judgment in the event the Fifth Circuit affirmed the federal district court's judgment. Id.
¶ 22. Generally, under the law-of-the-case doctrine, unless additional facts materially pertinent to a decision on second appeal are shown in the record, the former determination is controlling. See Holcomb v. McClure, 217 Miss. 617, 64 So.2d 689, 691 (1953) ("the law of the case as established on first appeal will ordinarily control on later trials and appeals of same case involving the same issues and facts"). However, this Court may, in certain exceptional instances, overturn a previous decision when that decision was manifestly erroneous, and upholding it on subsequent appeal would result in a grave injustice. Simpson v. State Farm Fire & Cas. Co., 564 So.2d 1374, 1377 (Miss.1990) (overruled in part on other grounds); Brewer v. Browning, 115 Miss. 358, 366, 76 So. 267, 270 (1917).
¶ 23. In the record now before this Court is the Fifth Circuit's unpublished opinion affirming the district court award. The Fifth Circuit added nothing specific that would enable this Court to resolve the quandary confronting this Court on first appeal, that being the lack of information regarding the measure of damages awarded for J.K.'s conversion claim. R.K. v. J.K., 946 So.2d 764, 777 n. 4. However, the Fifth Circuit's opinion has brought to light a number of procedural and substantive deficiencies that occurred in this matter when it was before the federal district court, which this Court did not consider on first appeal.
¶ 24. Ordinarily, based on numerous doctrines that need not be delineated for our purposes here, this would be of no concern to this Court. But due to the unique circumstances attending this case, which unfortunately contributed to the result of our previous decision, we find these deficiencies relevant to the matter before us.
¶ 25. The record, as will be discussed, indelibly reveals R.K. to be the party at fault. Thus, the uncertainty as to the measure of damages that confronted this Court on first appeal should rest with him. Therefore, we depart from our previous decision finding that R.K. was entitled to Rule 60(b) relief.

II. Second Appeal.
¶ 26. At the outset, we point out that the only measure of damages mentioned by this Court on first appeal was in footnote four of the opinion. See R.K. v. J.K. 946 So.2d at 777 n. 4. In response to R.K.'s assertion that J.K.'s federal jury award was an amount largely based on J.K.'s claim for conversion, we noted:
The district court cited as J.K.'s damages:
payments due her per the divorce settlement which R.K. stopped paying; mental anguish and emotional distress, for which she obtained medical treatment; missing approximately five days of work because of this federal case, for which she lost wages of $1050; incurring attorney's fees, which had reached approximately $45,000 by the end of April 2004; and $500 to a process server due to [R.K.'s] dodging process.
Id. at 776-77. This was a significant oversight by this Court, as the language was taken from the federal district court's September 14, 2004, Opinion and Order on the parties' motions for summary judgment. Thus, we deem it necessary to reiterate some of the above-mentioned facts of this case, and additionally point out what the *297 record discloses occurred in the federal case.

A. Recap with Modifications.
¶ 27. Again, the matter in federal district court began when R.K.'s "longtime" friend/legal counsel, C.G.,[3] filed suit against J.K., alleging wiretapping fraud in federal court just less than four months after the chancery court issued a final judgment of divorce on August 29, 2002.[4]Id. at 769. J.K. answered C.G.'s complaint and counterclaimed for state-law conversion and abuse of process. As part of the counterclaim, J.K. alleged C.G. had conspired with R.K. to commit the torts. Shortly thereafter, R.K. intervened in the suit, seeking damages from J.K. and an injunction against disclosure of the tapes' contents, basing his claims on the federal Wiretap Act. Federal Wiretap Act, 18 U.S.C. § 2515. J.K. then counterclaimed against R.K. for conspiracy, conversion, and abuse of process.
¶ 28. On September 14, 2004, the district court denied both R.K.'s and C.G.'s motions for summary judgment as to J.K.'s counterclaims for conspiracy and abuse of process.[5] According to the district court's order, J.K. had claimed that R.K. and C.G. instigated the federal action as a conspiracy to commit conversion. In its order, the district court set forth the elements a plaintiff must show to succeed in claims of conspiracy and abuse of process, respectively. As previously mentioned, the district court cited J.K.'s damages for conspiracy as follows: payments due her per the divorce settlement which R.K. stopped paying; mental anguish and emotional distress, for which she obtained medical treatment; missing approximately five days of work because of this federal case, for which she lost wages of $1,050; incurring attorney's fees, which had reached approximately $45,000 by the end of April 2004; and $500 for fees paid to a process server due to R.K.'s dodging process. Likewise, the district court cited these same damages for J.K.'s abuse-of-process claim.
¶ 29. Shortly thereafter, on November 15, 2004, in response to J.K.'s motion for contempt and specific performance, the chancery court ordered R.K. to pay $35,000 in arrears, and ordered that he continue the $5,000 monthly payments.
¶ 30. In February 2005, the federal trial was conducted. After jury selection but before opening statements, C.G. and J.K. voluntarily dismissed their claims against one another. At trial, according to the Fifth Circuit, R.K. asserted during his case-in-chief that he "was entitled" to withhold the property settlement payments under the terms of the agreement.
¶ 31. In her case-in-chief, J.K. submitted into evidence the chancery court's November 15 judgment finding R.K. in contempt of court for willfully failing to make the $5,000 monthly payments, and ordering that he pay the $35,000 owed in arrears.[6] During direct examination, J.K. *298 testified that R.K. had not paid her the $35,000, the arrearage of which had increased to $50,000 by the time of trial. The following exchange then took place between J.K. and her attorney:
Q. Let's talk about your damages, if any, for a minute [J.K.]. Since this federal case was filed and the things that have happened in the chancery case as well as beginning in December of 2002, what effect, if any, has all this litigation had on your mental or emotional condition?
A. It's been draining. It's been  I mean, can't sleep at night. Wake up in the middle of the night. ...
Q. Have you ever taken any tranquilizers or medicine for depression prior to May 1, 2004?
A. No, I have not.
Q. Did a time come when you did discuss medications with any physician?
A. Yes. ...
Q. What, if any medication did he prescribe for you ... ?
A. He prescribed a medication called Lexapro.
. . .
Q. So what has been your cost of that medication so far, first with the Lexapro?
A. $187.08.
Q. How about the Effexor?
A. $272.76.
. . .
Q. How much did Mr. Wilkinson charge for his efforts to serve [R.K.] with process?
A. $371.15.
. . .
Q. Look at Exhibit JK-36. ... What is that?
A. It's the proof of service  summons from Matt Hawkins.
. . .
Q. And how much did he charge for that?
A. $30.
Q. [J.K.] have you missed any time from work as a result of this litigation that [R.K.] and [C.G.] have filed against you?
A. Yes, sir.
Q. How much time off work have you missed?
A. Right at three weeks.
. . .
Q. How much do you get paid an hour?
A. $30.
Q. And do you know approximately the total hours you've missed?
A. 102 hours.
Q. And have you multiplied that out to see what your lost earnings as a result of this have been?
A. Yes, sir. It's $3060[.]
Q. And what was the total amount billed [fees and expenses from Daniel, Coker, Horton & Bell attorneys, as of January 12, 2005]?
A. $117,440.52.
. . .
Q. And what is the total amount billed?
A. $130,007.54.
¶ 32. After the close of evidence the district court instructed the jury on J.K.'s damages for conversion, abuse of process, and civil conspiracy:
If you find from a preponderance of the credible evidence that [J.K.] has proved her claims for conversion, abuse of process and/or conspiracy, you must consider whether [J.K.] suffered damages as a *299 result of any wrongful act of [R.K.], if any:
In considering an award of damages, you may consider:
1) Mental anguish and emotional distress for which she obtained medical treatment;
2) Cost of prescription drugs;
3) Lost wages;
4) Attorney's fees; and
5) Fees paid to a process server.
¶ 33. During closing arguments, J.K.'s attorney gave the following summation with regard to J.K.'s claim for damages:
As to [J.K.'s] damages, it's been proved through her testimony and through the testimony of Dr. Wiley that medication was necessary for the nervousness and stress, the anxiety that all this had put on her. And she's proved her damages on that were $406. ...
[S]he paid those process servers a total of $401.
She had lost earnings. She testified to the number of days that she lost from work and it was $3,060 she's lost from her job as a result of all these lawsuits. She's incurred  she's paid as long as she could and she hasn't been able in almost a year, but the attorney's fees she's incurred were $130,000. ... And, finally, her mental anguish and emotional distress throughout this ordeal. Since December of 2002, over two years, she's been put under this. And I submit to you that you need to evaluate that and return her a verdict of an adequate  that would adequately compensate her. That's about 700 days, I guess a bit more than that now. And I submit to you that $70,000 for that would not be too large a figure because this  [R.K.] should be discouraged from this sort of thing. He shouldn't ever again try to take this lady's money. I submit to you when you consider the evidence you should return a verdict for zero dollars for [R.K.] and return a verdict for [J.K.] on her counterclaim in the approximate amount of $200,000 for her actual damages.

B. Damages.
¶ 34. It is well-understood that in an action seeking damages, the plaintiff bears the burden of proof as to the amount of damages. Puckett Machinery Co. v. Edwards, 641 So.2d 29, 36 (Miss.1994) (citing City of New Albany v. Barkley, 510 So.2d 805, 808 (Miss.1987)). This requires the plaintiff to place into evidence such proof of damages as the nature of case permits, with as much accuracy as is reasonably possible. Thomas v. Global Boat Builders & Repairmen Inc., 482 So.2d 1112, 1116 (Miss.1986) (citation omitted). "Where the existence of damages has been established, the plaintiff will not be denied the damages awarded by a [fact finder] merely because a `measure of speculation and conjecture is required' in determining the amount of the damages." TXG Intrastate Pipeline Co. v. Grossnickle, 716 So.2d 991, 1017 (Miss.1997) (quoting Piney Woods Country Life Sch. v. Shell Oil Co., 905 F.2d 840, 845-46 (5th Cir.1990)). As it is well-recognized in Mississippi, "a party will not be permitted to escape liability because of the lack of a perfect measure of damages his wrong has caused." Aqua-Culture Technologies, Ltd. v. Holly, 677 So.2d 171, 184 (Miss.1996) (quoting R & S Dev., Inc. v. Wilson, 534 So.2d 1008, 1012 (Miss.1988)).
¶ 35. Typically, "[w]hen a defendant relies on matters in mitigation or reduction of damages, the burden is on him to make proof of facts which will operate to bring the mitigation into effect as against the opposite party." Poteete v. City of Water Valley, 207 Miss. 173, 42 *300 So.2d 112 (1949) (citations omitted). If a defendant wishes the jury instructed on such a matter it is incumbent upon the defendant to specifically request it, "either by an instruction on his own, or that it be added to one of the plaintiff's instructions." Young v. Robinson, 538 So.2d 781, 783 (Miss.1989) (holding that, "[i]n the absence of specifically calling the matters to the attention of the circuit judge and tendering a requested instruction embracing this issue, any error thereasto is waived") (citations omitted).
¶ 36. Under both federal and state law, juries are presumed to follow the instructions given to them by the trial judge. See Marshall v. Lonberger, 459 U.S. 422 n. 6, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983) ("the crucial assumption underlying the system of trial by jury is that juries will follow the instructions given them by the trial judge") (citation and inner quotation marks omitted); Johnson v. Fargo, 604 So.2d 306, 311 (Miss.1992) ("This Court assumes jurors will follow the instructions given to them by the trial court") (citations omitted). A damage instruction should confine the jury to such damages as are shown by evidence. Meaut v. Langlinais, 240 Miss. 242, 126 So.2d 866, 868 (1961) (citation omitted).
¶ 37. Here, while R.K. correctly points out that the measure of damages in a conversion action is the value of the property at the time of conversion, he fails to take into consideration that Mississippi also allows for consequential damages in similar actions, if warranted. See West v. Combs, 642 So.2d 917, 921 (Miss.1994) ("the measure of damages in a conversion action is the value of the property at the time and place of the conversion"); Cmty. Bank v. Courtney, 884 So.2d 767, 775 (Miss.2004) ("damages resulting from a conversion that are not ordinary, usual, or commonly to be expected, are [also] recoverable so long as the parties in question have those effects in contemplation at the time of the wrong as the probable result") (citing Pride Oil Co. v. Tommy Brooks Oil Co., 761 So.2d 187, 191-92 (Miss.2000)); see also West, 642 So.2d 917, 921 (Miss. 1994) ("punitive or exemplary damages may be awarded for the conversion of another's property if there is evidence of acts which are willful, wrong, malicious, or oppressive") (citing Phillips Distribs. Inc. v. Texaco, Inc., 190 So.2d 840 (Miss.1966)).
¶ 38. Based on our review of the complete record, it appears that the federal jury was instructed to consider compensatory damages as to J.K.'s abuse-of-process claim and nothing other than consequential damages on her conversion claim. Contra R.K. v. J.K. 946 So.2d at 777 (R.K. asserting that the federal jury award was an amount based largely on J.K.'s claim for conversion). Without speaking to the merits of the instruction itself, we can only conclude, as J.K. rightfully points out, that the jury presumably contemplated only that which the federal district court instructed it to consider: attorney's fees, fees paid to a process server, cost of prescription drugs, and mental anguish. Johnson, 604 So.2d at 311.

CONCLUSION
¶ 39. Our previous mandate to the chancery court ordering that R.K. be given relief under Rule 60(b) of the Mississippi Rules of Civil Procedure was clear error by this Court. Therefore, we reverse the chancery court's order granting said relief, and remand the matter to the chancery court with instructions that the lower court reinstitute J.K.'s adjudicated property distribution payments in full, giving R.K. credit for any amounts paid thereon, separate and apart from the federal jury award.
*301 ¶ 40. REVERSED AND REMANDED.
WALLER, C.J., GRAVES, P.J., RANDOLPH, LAMAR AND CHANDLER, JJ., CONCUR. CARLSON, P.J., DICKINSON AND KITCHENS, JJ., NOT PARTICIPATING.
NOTES
[1] Her claim of conspiracy was finally dismissed with prejudice.
[2] The chancery court awarded attorney's fees to each party relative to the court's contempt findings.
[3] R.K., who is a physician, also has a law degree, and met C.G. while in law school.
[4] According to the Fifth Circuit's unpublished opinion, C.G. testified at trial that, prior to filing suit, he had discussed with R.K. that he planned to sue J.K. and the potential impact of the settlement agreement on J.K.'s defense.
[5] In the order, the district court treated J.K.'s conversion claims, filed against both R.K. and C.G., as one with her conspiracy claims against each individually.
[6] On appeal before the Fifth Circuit, R.K. charged that the district court erred by admitting evidence of the chancery court's judgment finding him in contempt for his withholding alimony payments. The Fifth Circuit found the charge meritless, noting that R.K. first brought up upon direct examination during his case-in-chief the issue of whether the property settlement agreement allowed him to withhold the payments.